# HOWELL v. ACCIDENT & CASUALTY INS. CO. OF WINTERTHUR, SWITZERLAND.—221 S. W. (2d) 901.

**March 2, 1949.**

Petition for Certiorari denied by Supreme Court, June 18, 1949.

Chas. L. Neely, Robinson & Robinson, L. E. Gwinn, all of Memphis, for appellee.

Winchester & Bearman, John Heiskell, all of Memphis, for appellant.

SWEPSTON, J. The principal question on this appeal is the application of the "additional assured" provisions of an automobile insurance policy covering liability and property damage.

George Thomas Howell, appellee, obtained a judgment for $4,000.00 against William Franklin Shepherd for personal injuries inflicted by the automobile of Lydia Darragh, the assured, while it was being driven by Shepherd on his exclusive personal business. Execution was issued and a *nulla bona* return made on same. This suit was then filed against the insurance company, there was a jury trial in which one issue was submitted and answered as follows:

"Did William F. Shepherd have implied permission of Lydia Darragh to drive the 1939 Plymouth on October 28, 1942, when he was involved in a collision with George Thomas Howell?

"Answer: Yes."

A judgment for $4,771.93 was entered against the company, motion for a new trial was seasonably made and overruled, appeal has been perfected and the company has assigned error.

The first assignment is that there is no evidence to support the verdict.

This requires a review of the evidence which with all reasonable inferences therefrom must be viewed in the light favorable to complainant, Howell.

It is not claimed that Shepherd had express permission to use the automobile and it is clear that he did not.

In order to show implied consent or permission the following evidence was offered.

Miss Lydia Darragh, the insured, is a quite elderly lady entirely dependent financially on her brother, Captain Darragh, who is over eighty years old. He purchased the automobile, had the title put in her name alone and the insurance issued to her alone and pays all expenses of operation and maintenance.

She lived in an apartment close to town, while he lived at the home of Shepherd out on Princeton Road which is in the eastern suburbs of Memphis. The car was kept at his place of residence. The car really belonged to Captain Darragh and no question of fraudulent purpose in having the title in his sister is involved. He used it as his own, she considered it his and that he could do anything with it he might desire. No request for her permission was ever made nor deemed necessary.

Neither of them could drive it and he kept a chauffeur who was on duty from about nine-thirty to four-thirty daily but not Sunday. From time to time when either of them desired to use the car when the chauffer was not there, Shepherd would drive it for them.

Shepherd's testimony in part was as follows:

"Q. You say you have driven this car before? A. Oh, sure.

"Q. What did you do with the car, Mr. Shepherd? A. Well, a lot of times, Captain Darragh couldn't drive and the chauffeur wasn't there, he let him off of an afternoon, some afternoons, he was off one or two afternoons a week, and Cap wanted some Bromo-Seltzer, he takes it every day, or something like that. I would get the car and go downtown or to the drug store and pick him up some Bromo-Seltzer.

"Q. Where did he keep that 1939 Plymouth automobile? A. The garage at my house.

"Q. Did he keep it there all the time? A. Oh, yes, all the time.

"Q. And the Captain would send you occasionally to the drug store for medicine? A. That is right.

"Q. Did he ever send you any place else? A. Oh, yes, he would send me downtown to get him some cigars. That was during the war, cigars were scarce. I would go down to Botto's to get him some cigars.

"Q. Did you ever do anything else, Mr. Shepherd? Think the best you can, Mr. Shepherd, about the 1939 Plymouth automobile? A. I just used it around several times; didn't use it regularly every day like it was mine.

"Q. Did you ever have occasion to use that automobile for Miss Lydia Darragh? A. I have taken stuff over to her apartment.

"Q. What kind of stuff? A. Well, have some candy or something over at the house; you know, my wife would make up some candy, and Cap wanted, you know, would send some candy over there, and he couldn't drive, so I would drive by and leave her some candy, and I would go on down to the Post Office and pick up my mail, around like this.

. . . . . . .

"Q. Were there ever any occasions Miss Lydia needed that car when the chauffeur wasn't there, Mr. Shepherd? A. Sure, she needed it.

"Q. Who would drive it? A. One time—she is deaf, she uses one of those hearing aids, you know, and the battery went dead on it, she couldn't hear anything, and the chauffeur wasn't there, and I had to go over to her place and pick up the hearing aid—

"Q. Where was her place? A. At the Gilmore; and take it down to the Sterick Building, some office in the Sterick Building,—I don't know, the Sonotone, or one of the hearing aid places.

"Q. Who drove the car? A. I did.

"Q. What car? A. The Plymouth.

"Q. 1939 Plymouth automobile? A. The·only one he has had.

"Q. The only one he had at your house, is that right? A. Yes.

"Q. Did you ever drive Miss Lydia and the Captain any place else? A. Well, I have taken Miss Lydia and Mrs. Bruce—that is her sister—that is Captain Darragh's sister, and Miss Lydia and Miss Ida just died two or three months ago, she was old too,—and I picked them up and would take them downtown various times. I have stopped and dropped them off at the department store, go and get my mail, or something like that, come back in a little while and pick them up.

"Q. You would be driving the car? A. I would be driving it.

"Q. Did Miss Lydia ever object or remonstrate or make any statement to you that you shouldn't drive the car, you couldn't drive the car? A. I thought she appreciated me driving her around.

"Q. I see. Did you have any idea— A. (interrupting) I was doing her a favor and Cap a favor too.

"Q. Do you have any idea about how many times you have driven that car for Miss Lydia and for some particular use or benefit of Miss Lydia? A. No, that has been so long ago, you know, I couldn't name the number of times; just off and on, now and then.

"Q. You mentioned something about a chair to Mr. Neely and I, about on one occasion you carried Miss Lydia; if I recall, the Captain wanted her to have a chair. Do you remember that occasion? A. Yes; she can't hardly walk, and he wanted her to get a good easy rocker, so I picked she and Miss Ida Bruce up and take them down on South Main to some furniture store south of the Chisca; so they go in there, what they wanted was a reed rocker, and didn't find anything there. I drove them up to Goldsmith's on Front Street in the back, and it was level there, and they got out there, and I just waited on them until they went in there and found them a chair.

"Q. What did you do after they found them a chair? A. The chair was sent out; they come on back, and I took them some other place; they stopped some other place, and then they come back and I took them on home.

"Q. You were driving this same automobile? A. Yes.

"Q. Same 1939 automobile? A. Yes.

"Q. I believe you stated that on that occasion and no other occasion did Miss Lydia ever object to your driving the automobile? A. No, sir.

"Q. When the chauffeur was away and Miss Lydia needed anything, that is, Miss Lydia or Captain, and it was necessary to go off, state whether or not you had the right and privilege to use that automobile?

"Mr. Bearman: I object—

"Mr. Robinson: I will re-phrase it; I think the objection is well taken.

"Q. State whether or not, in the absence of the chauffeur, due to the fact that Miss Lydia had never driven a car, and Captain Darragh couldn't drive a car, if there was an occasion when Miss Lydia needed something

as a matter of emergency, or Captain needed something as a matter of emergency, and you were instructed to use the car by the Captain? A. Oh, sure, plenty of times.

"Q. Did you ever have occasion to go from your home in this 1939 Plymouth automobile to Miss Lydia's home at the Gilmore Apartments and pick up Miss Lydia and bring her out to your home to visit the Captain? A. Yes, I have done that.

"Q. Many or few times? A. A few times, not a lot of times.

"Q. When Miss Lydia was to go back to her home at the Gilmore Apartments, how did she get back? A. I would take her back.

"Q. In what? A. In the Plymouth.

"Q. Who did the driving? A. I would drive.

"Q. Was there ever any objection or limitation on her part? A. No.

"Q. Did she ever intimate any objection to your driving the car? A. No; I presume she was glad for me to do that for her; in fact, I was glad to do that for her.

.    .    .    .    .    .

"Q. (By Mr. Robinson) Mr. Shepherd, I believe I asked you on yesterday—I am not absolutely certain about it and I want the record to disclose this situation notwithstanding, had you ever used this car before for your personal use and benefit prior to the date the accident occurred in October, 1942? A. Oh, yes, I have driven downtown to possibly make a call, and usually get my mail, or something like that.

"Q. Had you ever driven the car out of the city? A. No.

"Q. That was the first time? A. It is the first time I had driven out of the city, was the time I had this wreck."

This course of conduct obtained for several years prior to the accident herein involved.

On the morning of the accident Shepherd had borrowed the car at the suggestion of and from Captain Darragh for the purpose of going to Milan, Tennessee on Shepherd's own business and was on such mission when the accident occurred. Miss Darragh knew nothing about the loan of the car but if she had known, it is reasonable to infer that she would have offered no objection and in fact would have approved, if her brother had asked for her approval.

It is shown that when the policy was written (as a renewal) no investigation was made as to whether either Miss Darragh or Captain Darragh drove an automobile; that there would have been no additional premium if Captain Darragh's name had been included as an additional assured.

Was this evidence sufficient, then, to justify submission to the jury of the question of implied consent of Miss Darragh to the use by Shepherd of her automobile in making a trip to Milan on his own business?

If not, then there is no evidence to support the verdict.

Stated differently, where there is evidence that the assured knew of repeated instances of Shepherd's driving of the car on her business and that of her brother in and around the City of Memphis and not only did not object but tacitly approved same and would have given express approval, if called on; where it is a reasonable inference that she had reason to believe that Shepherd in taking her shopping, leaving her and returning for her may have

been using the car on missions of his own in the interim, but she never raised any question nor prohibited same; where likewise she had reason to suppose or believe that her brother was permitting Shepherd at times to use the car on missions of his own, but failed to question or to disapprove; where if she had had any thoughts about the matter, she would undoubtedly have given her approval, if called on; from all this was it a fair inference by the jury that she had impliedly given her consent or permission to Shepherd's use of the car generally subject to the convenience of herself and her brother, even though the use by Shepherd for his own purpose may have been casual and infrequent?

If Shepherd had this general permission of the assured, would this be sufficient for the particular use on October 28, 1942?

■ The clause of the policy under consideration is in this language:

"Definition of 'Insured.'

"The unqualified word 'Insured' wherever used in Coverages A and B and in other parts of this policy, when applicable to such coverages, includes the named Insured and, except where specifically states to the contrary, also includes any person while using the automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is with the permission of the Named Insured."

We may at once disabuse our minds of the idea that under such a provision the named assured may delegate by general or blanket authority to another the power to select the person or persons who may actually use, which term includes operation or driving, the car, insofar as the insurer is to be bound by such delegation.

To extend the coverage to another person using the car, the assured must either expressly or impliedly exercise the discretion vested in assured alone to select the person who is to use the car. American Auto Ins. Co. v. Jones, 163 Tenn. 605, 4g S. W. (2d) 52; Card v. Commercial Cas. Ins. Co. 20 Tenn. App. 132, 95 S. W. (2d) 1281.

If in the instant case Captain Darragh had entrusted the car to a person who had never been known by the assured to have used the car previously or at that time, we would have no hesitancy in holding that that person was not an additional assured, even though the assured had attempted to delegate such discretion to her brother.

The case of Odden v. Union Indemnity Co., 156 Wash. 10, 286 P. 59, 72 A. L. R. 1363, referred to in American Auto v. Jones, supra, seems to hold otherwise, but we think the Jones and the Card cases, supra, fix the rule in Tennessee that there can be no delegation by the assured by blanket authority to another to select still others who may use the car and whose identity is unknown to assured.

Yet we think it equally clear from the Card case that if there had been evidence of knowledge by the assured that Robert Lasseter had driven the car on previous occasions, the decision would have been to the contrary of the result reached.

In that case R. R. Ogilvie trading as R. R. Ogilvie & Co. in the building supply business was the assured. He permitted his employee, Rollin Lasseter to use the automobile for business or pleasure. Rollin permitted his brother, Robert, who was not an employee, to use the car on an errand for Rollin's wife's surveyor, and the surveyor was killed in an accident on this trip home.

The Court said [20 Tenn. App. 132, 95 S. W. 2d 1283]: "It is not shown by any witness that Ogilvie ever gave permission to Robert Lasseter to use the car. It is not shown that Ogilvie ever knew that he had driven it. Nobody undertook to testify along this line but the two Lasseters, and they both said that as far as they knew Ogilvie did not know that Robert Lasseter had ever driven it. There is, therefore, no proof to establish an implied permission. * * *"

But the Court further said:

"It is not necessary that the named assured signify his 'permission' in any particular manner. It is sufficient if he signifies the permission by a course of conduct, and under some circumstances mere silence may be sufficient. In this sense 'implied permission' from the named assured would be sufficient to bring a driver within the additional assured clause.

"But such 'implied permission' must be the act or conduct of the named assured. It must amount to an intended selection of the person to operate the car. No implied permission can arise merely because a man obtained possession of the car, without the knowledge of the named assured, regardless of what permission was given by other persons. Of course, the named assured could transmit his permission through an agent or in any other manner. The essential point is whether the named assured exercises his personal discretion and grants his own permission to the particular person."

Now, in the instant case there is evidence that the assured knew that Shepherd had driven the car repeatedly for her and for her brother; there is a reasonable inference that she knew he had driven it for his own pur-

poses; there is evidence that it was agreeable to and impliedly approved by her.

Of course, we do have the peculiar situation that she did not consider herself to be the owner of the car. Yet with reference to the insurance company she was the owner, and with that ownership must travel all benefits and all burdens, customarily and legally appurtenant with respect to both parties to the contract.

Complainant, not being a party to the contract, has not sought nor could he have a reformation of the contract, and the defendant has not sought a rescission or cancellation on the ground that Miss Darragh was not sole owner.

Complainant is simply a third party beneficiary.

We are, therefore, of opinion that the issue was properly submitted to the jury.

We overrule Assignment I.

Assignments II and III complain of the failure of the Chancellor to grant defendant's motion at the close of complainant's proof and at the close of all the proof to withdraw the issue from the jury.

What we have said applies also to these two assignments.

The additional point is made under them that since the undisputed proof shows that Shepherd had never used the car outside the City of Memphis, there could be no implied authority to use it on an extended trip.

This is answered in the Card case. "When the named assured grants permission to a certain person to drive the automobile, then that person becomes an 'additional assured' within the terms of the policy. Merely because the driver deviates from the intended route, or uses the car for a purpose not intended by the owner, does

not remove him from the coverage of the insurance policy. The insurance company is not concerned as to where or for what purpose the car is being driven. * * * '' (Citing) Stovall v. New York Indemnity Co., 157 Tenn. 301, 8 S. W. 2d 473, 72 A. L. R. 1368, and the Jones case, supra.

We, therefore, overruled Assignments II and III.

■ Assignment IV is overruled because the Court was not requested to charge that the jury should consider the case free of passion, prejudice, caprice, speculation, etc.

The jury is sworn to try every case fairly and impartially and every juror understands that he is supposed to do just that.

■ Assignments V through IX relate to the admission of certain testimony showing the relationship financial and generally between Miss Darragh and her brother and between them and the insurance agent. The bill contains two theories, one that the company should be charged with knowledge that Captain Darragh was the actual owner of the car and had a right to designate any additional assured, the other that Shepherd had the permission of both of the Darraghs to use the car.

In one instance the court stated that it was admitted only on the theory of permission by Miss Darragh. In another the court expressly stated that the ''testimony had no probative force as to ownership'' by Captain Darragh. This taken in connection with the very clear charge obviated any confusion of the jury.

These assignments are overruled.

■ Assignments X through XV complain of the failure to charge certain special requests by defendant.

We have examined each carefully, but we think each was amply covered by the charge as given.

We think the court gave a fair, lucid and correct charge.

All assignments are overruled, the judgment below is affirmed and a judgment will be entered here for $4771.93 with interest from May 10, 1948 and costs.

Anderson, P. J., and Baptist, J., concur.