# JOSEPH HETTLEMAN

*vs.*

## ISRAEL FRANK.

*Attorney and Client—Payment to Procure Release from Draft—Suit by Client to Recover—Evidence.*

In an action to recover money paid by plaintiff to defendant for services agreed to be rendered by the latter in obtaining reclassification of the former under the Selective Service Act, the question of defendant's right to charge for such services, in view of his being a member of the Legal Advisory Board, could not be considered on appeal, if no instructions in that regard were asked for or granted. p. 360

In an action to recover money paid by plaintiff to defendant for services agreed to be rendered by the latter in obtaining reclassification under the Selective Service Act, defendant having accepted a payment from plaintiff subject to an understanding that it was to be "applied for expenses and court costs in procuring a release" from military service and that "in the event" defendant did not obtain such release for plaintiff, defendant was to return the payment, a refusal to withdraw the case from the jury for lack of evidence was proper, there being no evidence that any court costs or expenses were incurred by defendant, and there being some evidence that the desired reclassification of plaintiff was the result of his own interview with the chairman of the local board. p. 361

Testimony by plaintiff that he was first classified in class five, this exempting him from service, and that he was subsequently classified in class one, this making him liable for service, that he never received any notice from the "board about being called into the service," and that he was never in the United States military service, was unobjectionable. p. 361

In an action to recover money paid by plaintiff to defendant for services to be rendered by the latter in obtaining reclassification under the Selective Service Act, it was proper to refuse to compel the plaintiff to answer defendant's question whether he "believed" that the defendant had the "power" to release him from the draft, after he had repeatedly stated that he did

not know, it being immaterial what the plaintiff "believed" in
reference to defendant's power.                          p. 362

Error in striking out a statement by a witness was harmless
if the statement was subsequently repeated by him.       p. 362

The courts may properly take judicial notice of the Selective
Service Rules and Regulations, they having been prescribed by
the President in accordance with authority expressly conferred
by Act of Congress.            .                         p. 362

In an action to recover money paid by plaintiff, an alien, to
defendant, for services agreed to be rendered by the latter in
obtaining the former's reclassification, under the Selective Serv-
ice Act, by a local board sitting in another state, it was proper
to exclude a circular letter issued by the adjutant-general of
such state in regard to the unwarranted reclassification of aliens.
                             .                          p. 363

*Decided April 21st, 1920.*

Appeal from the Baltimore City Court. (DUFFY, J.).

The cause was argued before BOYD, C. J., BRISCOE,
THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and
OFFUTT, JJ.

*Edwin T. Dickerson* and *David Ash,* for the appellant.

*John H. Hessey* and *Jacob S. New,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a judgment of the Baltimore City
Court. The suit was brought on the common counts in *as-
sumpsit,* and there was filed with the declaration the follow-
ing account:

> "Baltimore, Md., Feb. 12, 1919.
> "Joseph Hettleman,
>                      To Israel Frank, Dr.    ·
> "Sept. 28th—Cash money advanced by Israel
>         Frank to Joseph Hettleman............$100.00
> "Oct. 3rd—Cash money advanced by Israel
>         Frank to Joseph Hettleman........... 100.00
>                                            ————————
>                                            $200.00."

The defendant pleaded never indebted as alleged and never promised as alleged, and for a third plea alleged, "That the said sum of two hundrd dollars ($200.00) was received by him from the said plaintiff, on the days as set forth in the writing attached to the declaration, but that the said sum of money was received by said defendant as a fee for professional services as an attorney-at-law and was so agreed to between the said plaintiff and the said defendant at the time the said sum of money was received by the said defendant from the said plaintiff." The Court below sustained a demurrer to the third plea, and the case went to trial on issues joined on the first and second pleas, and resulted in a verdict and judgment in favor of the plaintiff for $212.00.

No objection was made in this Court to the ruling of the Court below on the demurrer, but the appellant insists that there was serious error in the rulings of the lower Court on the evidence and prayers embraced in twenty-one bills of exception.

The plaintiff offered evidence tending to show that he was a citizen of Russia, and had never declared his intention to become a citizen of the United States. He was twenty-four years of age, and came to the United States in 1914, and lived in Baltimore until April 8th, 1917, when he went to work in the City of New York, and lived there until he returned to Baltimore on the 29th of July, 1918. While living in New York he was required to register there under the Act of Congress of May 18th, 1917, known as the Selective Service Law, and was classified by the Local Board in Class 5 F. Subsequently he received a notice from the Local Board that he had been reclassified by that board and placed in Class 1 A. The Selective Service Rules and Regulations prescribed by the President of the United States in pursuance of the Selective Service Law provided that a resident alien, not an alien enemy, who had not declared his intention to become a citizen of the United States, was entitled to

be classified in Class 5 F, and that the effect of such classification was "to grant exemption or discharge from draft," while the effect of classification in Class 1 was to render the man so classified "presently liable for military service in the order determined by the national drawing," and as the plaintiff did not want to enter the military service, after receiving the notice of his reclassification, and before leaving New York, he went to see the chairman of the Local Board, explained the matter to him, told him he was a Russian alien and had only been in this country about four years, and gave him the names of some witnesses so that he might take the matter up with the Local Board for the purpose of securing his reclassification in Class 5 F. He told the chairman of the Local Board that he was going to Baltimore and gave him his Baltimore address. The plaintiff also testified that some time after he returned to Baltimore from New York he "had a little case with the United Railways," and that his sister-in-law sent him to Doctor Katzoff, who was well known at the Railways Company's office, and that after he explained the case to Doctor Katzoff, Doctor Katzoff said to him, "Frank, we will go down Saturday, and we will get the money from the United Railways"; that he met Doctor Katzoff at his house and they went to the office of the "United Railways" and got $70.00; that Doctor Katzoff retained $35.00 of it for himself and gave him the remaining $35.00, and that when they were leaving the office of the Railways Company Doctor Katzoff said to him, "Mr. Frank I have got a man that is going to take you out from the draft. His price, he says, is $300.00"; that he told Doctor Katzoff that he did not have more than $200.00—$165.00, which was all he had saved, and the $35.00 he got from the Railways Company, and that Doctor Katzoff replied, "Well, I will take you over in his office and see what he can do"; that Doctor Katzoff took him right over to the defendant's office and explained the matter to the defendant, and that the defendant said to him, "Well, Frank, being you are a poor

man, I will do it for you for $200.00"; that the defendant
told him of a man he had gotten discharged from Camp
Meade, and of two other cases that he had pending, and
that he would not make anything out of the $200.00, as he
would have to make several trips to New York and would
have to take a sleeper, which was expensive, and that he
would keep an account of and would show him all of his
expenses; that he then paid the defendant $100.00, and that
the following week he paid him the other $100.00, for which
payments he received from the defendant the following re-
ceipts:

"Joseph Hettleman, Attorney-at-Law,
"Rooms 27-29 Courtland Bldg., 215-217 Courtland
Street,
"Phone: St. Paul 2225.
"Res.: 311 N. Broadway, Phone: Wolf 630-W.
"Baltimore, Md., September 28, 1918.

"This is to certify that I have this day received
from Israel Frank the sum of one hundred dollars for
professional services in connection for obtaining his
discharge from the military service of the U. S. Army
on the ground that he is an alien, a non-declarant and
a subject of Russia, and who has been reclassified from
Class 5F and placed in Class 1A by his Local Board.
"Joseph Hettleman."


"Joseph Hettleman, Attorney-at-Law,
"Rooms 27-29 Courtland Bldg., 215-217 Courtland
Street,
"Phone: St. Paul 2225.
"Res.: 311 N. Broadway, Phone: Wolf 630-W.
"Baltimore, Md., October 3, 1918.

"This is to certify that I have this day received
from Israel Frank the sum of one hundred dollars for
profesisonal services in connection with the draft for
the purpose of obtaining a release from the military
service of the United States on account of illegal in-
duction, all of this to be applied for expenses and

court costs in the procuring of a release; in the event
of not obtaining a release for the said Mr. Israel Frank
from the said military service by way of exemption
as he is entitled to under the draft, then the said
Joseph Hettleman is to return the said one hundred
dollars to the said Israel Frank.

"Joseph Hettleman."

The plaintiff further testified that after he had paid the
defendant the $200.00 he went to his office nearly every day
to inquire whether he had heard anything from New York
in regard to the matter; that defendant told him that he had
decided that he did not have to go to New York, but that
he had written to the Adjutant General of New York, and
showed him the letter and the reply thereto, but that he did
not understand them, and that they did not "amount to
much"; that every time he went to the defendant's office the
defendant told him that "there was nothing new"; that
about three weeks after he paid the second one hundred dol-
lars he received a notice from the Local Board that he had
been reclassified in Class 5 F; that as soon as he got the
notice he called up the defendant by telephone and asked
him if he had heard anything, and that the defendant said
he had not, and that he then went to the defendant's office,
and after again asking him if there was anything new and
if he had done anything, and after the defendant replied,
"No Frank, even if they take you to the camps, I will take
you out from the camps," in order "to get some money back
from him," he told the defendant that he wanted to give the
case up, and that the defendant replied that he did not care
if he "give up or not," that he had done "plenty" for the
$200.00 paid him; that he then showed the defendant the
postal card he had received containing the notice of his re-
classification in Class 5 F, and that the defendant became
angry with him and told him to get out of his office. The
postal card referred to was post-marked "New York, N. Y.,

Oct. 17, 7:30 P. M., 1918, Sta. B," and the plaintiff, in giving his reasons for demanding a return of some of the money he paid the defendant, stated on cross-examination that the defendant had not done anything towards securing his reclassification or exemption from military service other than write the letter to the Adjutant General, and did not know until he showed him the notice that he had been reclassified, and that he was sure that his reclassification was brought about by the chairman of the Local Board to whom he talked before leaving New York; that the reason he "put this matter in the hands of the" defendant after having "put it in the hands of the chairman of the Local Board, was because I was not sure the chairman was going to do anything"; that Doctor Katzoff told him that he knew of several "fellows" that the defendant had already gotten out of Camp Meade, and that he, the plaintiff, did not mind paying the $200.00, which was all the money he had in the world, if it became necessary to secure his discharge from camp. The plaintiff also offered in evidence a certified copy of the oath taken by the defendant as Associate Member of the Legal Advisory Board of the Fourth Legislative District of Baltimore, Sections 10, 203, 45, 46, 14, and 25 rule B of the regulations prescribed by the President of the United States in pursuance of the Selective Service Law, and also a copy of said Rules and Regulations and of the proclamation of the President.

Doctor Solomon Katzoff, a witness for the defendant, testified that the plaintiff was injured by one of the cars of the United Railways Company, and that he attended him; that they settled the matter at the company's office; that while there the plaintiff showed him a postal card about something in reference to "Class A, in Class 1," and told him that he was a Russian alien, and said that he did not know why he should not be in "Class 5"; that he told the plaintiff that he had heard of the defendant having similar cases and advised him to go to see the defendant; that he had no interest in

the case "only to help the boy along"; that the plaintiff said that he did not want to be dragged into the United States Army and requested him to take him to the defendant's office, and that they went there from the office of the United Railways Company; that he introduced the plaintiff to the defendant, and the "story was told" to the defendant, and that the defendant said he thought the plaintiff belonged in Class 5, and that he would take the matter up for him; that "the arrangement for price was $300.00"; that plaintiff "only had $100.00 in his pocket"; that about a month or two after that, "I think it was after the Armistice was signed," the plaintiff came to him and said, "I am put in Class 5 now"; that at the time he took the plaintiff to the defendant's office the plaintiff was in possession of a postal card ordering him to report for military service; that he, witness, read the card "where it showed that he had to report, to go to camp," and that that was the reason that the plaintiff got "a little bit ticklish about employing an attorney to change the class."

The defendant testified that he was an attorney-at-law and had practiced in Baltimore since 1913; that Doctor Katzoff brought the plaintiff to his office and introduced him, and that he made an agreement with the plaintiff; that Doctor Katzoff then left the office, and after he left the plaintiff gave him $100.00; that he did not know until "just now, at this trial," that plaintiff had received a postal card exempting him from military service; that he, the witness, never received any information from the Local Board or Adjutant General that the plaintiff was "exempted," but that he did get information from the District Board in New York, while he was in New York, that the plaintiff would not be called; that he went to New York twice "on this business"; that he went once "specially on his case," and another time on another case; that owing to certain rules adopted by the Local Boards of New York the plaintiff's case "was particularly" a case for the District Court and not for the

Local Boards; that when the plaintiff came to him and he "had gotten answers to his various questions," he told him that he "might have to take his case to the District Court for a writ of *habeas corpus.*" The defendant further testified that he had four similar cases there and had succeeded in them, and said, "I told Frank (the plaintiff) that my charges are this: $100.00 I must have from him because of the expenses involved in this case. I would have to go to New York; he was a New York draftee. Had he been a local draftee, it would have been a different thing; I would not have charged him anything, but because he was an out-of-town man—out of my jurisdiction, practically. When I took this case I understood I was doing the right thing; that I had a right to charge him, and I told him it would cost $300.00. I was a member of the Legal Advisory Board in Baltimore City, and I worked pretty hard, too. I told him it would cost him $100.00 immediately; that I wanted that in cash, and $100.00 he would have to put up with me or somebody suitable to him, and $100.00 would be payable after he was exempted. In fact I depended on his honesty for the last $100.00." He said further that the first thing he did was to write a letter to the Adjutant General of New York, which letter was offered in evidence; that the plaintiff left with him a postal card showing that under date of January 18, 1918, he had been classified in Class 5, which was an alien's classification, and that he also left with him a postal card, dated September 3rd, 1918, which said he was reclassified in Class 1-A; that on September 28, 1918, he wrote a letter to the Local Board, which letter was offered in evidence; that he remembered distinctly that he went to New York once on the plaintiff's case, and that as he had written to the Adjutant General and to the Local Board he went to see the District Board, and had a conversation with the person in charge there; that he heard nothing from the members of the board or from any one else until November 5th, when

there was talk of the Armistice, and that about a week later the plaintiff came to his office and said, "I want my $100.00 back," and that if he was called to the military service he would not have to go because the war was over, and that he thought that he, defendant, ought to give him the $100.00 back; that he told plaintiff that he had rendered the services; that plaintiff came twice after that, and that the next thing was a letter from the plaintiff's attorney, who suggested that he should not charge more than $50.00, and that he told him that he could not make a charge for him. After stating more in detail the work he did in connection with the plaintiff's case, the defendant further testified: "I understood that the members of the Legal Advisory Board were not to charge any fee for their services while the work consisted of making up questionnaires or sitting at the Local Boards as advisory members; under the circumstances of this case I thought I had a right to make a contract with this man and charge him a fee, he came in and said he wanted to pay for my services, he immediately said to me he wanted to pay me $300.00 and I accepted his offer and then I proceeded to do the work. I did not know that this man had a postal card that he had been exempted after my work until this trial. It was arranged that if he were not exempted I would give him back $100.00; and that at all events I was to keep $100.00 for my trip to New York, including the expenses thereof."

The theory upon which the suit was brought and upon which the case was tried by the plaintiff in the Court below was that under the Selective Service Rules and Regulations the defendant, who was an associate member of one of the Legal Advisory Boards of Baltimore City, had no right to charge for the services he rendered or agreed to render the plaintiff. But upon the record before us we are not called upon to decide or to express any opinion in regard to that question. No instructions containing that proposition were asked for by the plaintiff or granted by the Court below, and

the only instructions asked for in the case were the prayers offered by the defendant, which sought to withdraw the case from the jury on the ground that there was no evidence in the case legally sufficient to entitle the plaintiff to recover. It is apparent from the evidence to which we have already referred that these prayers were properly rejected. The second receipt stated that "all" of the $100 therein mentioned was to be "applied for expenses and court costs in procuring a release," and that "in the event" the *defendant* did not obtain a release for the plaintiff the defendant was to return to him the $100.00 referred to. There was no evidence in the case of any "court costs" or of the expenses incurred by the defendant, and there was some evidence tending to show that the reclassification of the plaintiff was the result of his interview with the chairman of the Local Board before he left New York. In view of this evidence, and of the testimony of the plaintiff and of the defendant as to the terms of the contract, it was for the jury to determine what the contract between the plaintiff and the defendant was, and it was also for the jury to determine, under proper instructions from the Court, how much, if any, of the $200.00 paid by the plaintiff to the defendant the plaintiff was entitled to recover.

We have carefully examined all of the twenty exceptions to the rulings of the Court below on the evidence and do not find reversible error in any of them. The first, second and third exceptions are to the action of the Court in permitting the plaintiff to state that he was first classified in Class 5, and that he was subsequently classified in Class 1; that he never received any notice from the "board about being called into the service," and that he was never in the military service of the United States. This evidence was not objectionable, and moreover the postal cards notifying the plaintiff of his classification were offered in evidence by the defendant, who also testified that he told the plaintiff that if he

was sent to one of the camps he would secure his discharge. The fourth exception was to the refusal of the Court below to permit the defendant to insist upon the plaintiff stating whether he *"believed"* that the defendant had the *"power"* to release him from the draft, after he had repeatedly stated that he did not know. What the plaintiff *believed* in reference to the *power* of the defendant was not material in this case, and the ruling was correct. The statement of the witness stricken out in the fifth exception was subsequently repeated by the witness and the defendant was not therefore injured by the ruling excepted to. The evidence ruled out in the sixth exception was subsequently introduced by the defendant. The seventh, eighth, ninth, tenth and eleventh exceptions were to the admission in evidence of the Selective Service Rules and Regulations. These Rules and Regulations were matters of which the Court took judicial notice, and it was not necessary to prove them, and as no instructions based upon their provisions were asked for or granted by the Court below their admission in evidence furnishes no ground for a reversal of the judgment. It is said in 16 *Cyc.,* on page 849 : "Judicial notice or knowledge may be defined as the cognizance of certain facts which judges and jurors may, under the rules of legal procedure or otherwise, properly take and act upon without proof because they already know them," and on page 907 of the same volume it is said: "Courts take judicial cognizance of proclamations, messages, or orders issued by the chief executive or by his authority." In *State* v. *Main,* 69 Conn. 123, the Court said: "Judicial notice takes the place of proof and is of equal force. As a means of establishing facts, it is therefore superior to evidence. In its appropriate field, it displaces evidence, since, as it stands for proof, it fulfills the object which evidence is designed to fulfill, and makes evidence unnecessary." See also *State* v. *Downs,* 148 Ind. 324, 47 N. E. 670, where the Court said: "That which is judicially known need not be-

alleged or proven." It is said in 15 *R. C. L.,* page 1057, "Courts should take notice of whatever is or ought to be generally known, within the limits of their jurisdiction, for justice does not require that Courts profess to be more ignorant than the rest of mankind," and one pages 1109, 1110 it is said that courts take judicial notice of the proclamations of the executive, and of the rules of executive departments of the Government. In *Eastwood* v. *Kennedy,* 44 Md. 563, and *Dickey* v. *Pocomoke City Bank,* 89 Md. 280, the Court held that the courts in this State take judicial notice of the Acts of Congress of a public nature or character. Section 4 of the Act of Congress of May 18th, 1917, expressly authorized the President to make the rules and regulations referred to, and it is said in 26 *R. C. L.,* page 1430: "It may be laid down as a general rule, deducible from the cases, that whenever, by the express language of an Act of Congress, power is entrusted to either of the principal departments of government to prescribe rules and regulations for the transaction of business in which the public is interested, and in respect of which they have a right to participate, and by which they are to be controlled, the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice. Such regulations cannot be questioned or defied, because they may be thought unwise or mistaken; and are regarded as having the force of law." The evidence objected to in the twelfth and thirteenth exceptions was subsequently introduced without objection, and the statements of the witness stricken out in the fourteenth exception were later repeated by him, and the defendant got the benefit of them. The evidence excluded in the fifteenth exception was a circular letter issued by the Adjutant General of the State of New York and was clearly not admissible in this case. The same may be said of the evidence excluded in the sixteenth exception, which was another circular letter. The evidence stricken out in the

seventeenth exception was not admissible. The statement of counsel for the plaintiff to the defendant that he proposed to take the matter up with the District Attorney could not have aided the jury in passing upon the issues in the case. What the defendant did in other cases was not admissible evidence in this case, and there was no error in the ruling of the Court in the eighteenth exception. The defendant could not have been injured by his answer to the question objected to in the nineteenth exception, and the question objected to in the twentieth exception was proper cross-examination of the defendant, who had testified in chief that the plaintiff had agreed to pay him $300.00 for his services.

It follows from what has been said that the judgment appealed from must be affirmed.

*Judgment affirmed, with costs..*