## ALLSTATE INSURANCE COMPANY ET AL. *v.* FEDERAL INSURANCE COMPANY ET AL.

[No. 56, September Term, 1974.]

*Decided October 16, 1974.*

The cause was argued before THOMPSON, GILBERT and MENCHINE, JJ.

*F. Gray Goudy* and *Herbert Burgunder, Jr.* for appellants -cross-appellees.

*Delverne A. Dressel* and *Emanuel H. Horn,* with whom were *Dickerson, Nice, Sokol & Horn* and *Hal C. B. Clagett* and *Sasscer, Clagett, Channing & Bucher,* on the brief, for appellees-cross-appellants.

*William L. Kaplan,* with whom were *Feissner, Kaplan, Smith, Joseph, Greenwald & Laake* on the brief, for appellees Billy N. and Katherine Fragnoli.

*Samuel O. Jackson, Jr.,* with whom were *Max R. Israelson, Israelson, Pines & Jackson P.A.* and *Louis F. Friedman* and *Miles & Friedman* on the brief, for appellee Sarah E. Allison.

GILBERT, J., delivered the opinion of the Court.

On January 10, 1972 a Cadillac, operated in a southerly direction on the Baltimore-Washington Parkway, apparently went out of control, crossed the median strip situate between the north and southbound lanes of the Parkway, and entered the northbound lane. A four car collision occurred. A number of personal injury and property claims arose against the then driver of the Cadillac, its owner, a company licensed by the Interstate Commerce Commission to transport, for a fee, motor vehicles from New

York to Florida, and the individual who had contracted with the carrier to drive the vehicle to Florida.

The direct result of the multiplicity of tort actions brought against the alleged tort-feasors is that the insurance carriers for the defendants have been unable to agree as to which of them is cast in the role of primary insurer.

Max Schwartz (Schwartz), the owner of the Cadillac, together with his insurance carrier, Federal Insurance Company (Federal), filed, in the Circuit Court for Prince George's County, a petition for a declaratory decree. The petition joined (1) the common carrier Dominick Spinelli, trading as Direct Way Auto Shippers (Spinelli), (2) Allstate Insurance Company (Allstate), the insurance carrier for Spinelli, (3) Market Insurance Company (Market), the admitted excess coverage carrier for Spinelli, (4) the contract driver of the vehicle, Richard C. Frank (Frank), (5) the person who was driving the car at the time of the collision, James J. Straz (Straz), and (6) various persons whose claims arose out of the accident.

The record reflects that Schwartz was desirous of spending some time in Florida. In response to a newspaper advertisement he contacted Spinelli, who agreed to have Schwartz's vehicle driven to Florida for a charge made in accordance with the tariff promulgated by the Interstate Commerce Commission (ICC). Schwartz executed a Bill of Lading in which he agreed to pay Spinelli ninety dollars. Fifty dollars was paid to Spinelli at the time of execution of the Bill of Lading, and the balance was to be paid in Florida upon the delivery of the automobile. Schwartz further agreed that his vehicle was insured by a responsible automobile insurance carrier.

At the same time that the newspaper advertisement for the solicitation of business was appearing in the *New York Times*, another advertisement was placed by Spinelli in *The Village Voice*. The *Village Voice* advertisement solicited persons to drive motor vehicles to Florida. Frank answered that advertisement and agreed to drive Schwartz's Cadillac to its destination. By the terms of Frank's written

agreement with Spinelli, Frank paid forty dollars to Spinelli. Spinelli was then in receipt of the total ninety dollars tariff. Frank was, upon arrival in Florida, to collect from Schwartz the forty dollars balance and to keep the same. Patently Frank's only payment was free transportation, but he was responsible for gas and oil used in the course of the trip.[1]

Frank had arranged with two other persons, Straz and Katherine Fragnoli, to travel with him to Florida. There is a conflict in the depositions filed in this proceeding as to whether either Schwartz or Spinelli knew that other persons would accompany Frank. In any event, the Bill of Lading provided that the carrier might transport persons other than the driver if the same was not done for hire. Frank, Straz and Fragnoli had agreed amongst themselves that they would share equally the cost of the drive to Florida. No one paid Spinelli to ride in the Cadillac and the "for hire" exception is not before us. Frank drove the Cadillac from New York to somewhere in New Jersey where Straz took over the driving, and, as we have previously stated, he was the driver at the time of the incident giving rise to the instant ligitation.

Allstate and Spinelli argue that because Straz was driving the Schwartz vehicle with the permission of Schwartz, Federal is responsible for primary coverage under its policy, and Allstate is responsible only for any excess over and above Federal's policy limits. Schwartz and Federal take a different view. They contend that Allstate is the insurer responsible for primary coverage because of its ICC endorsement on the policy issued to Spinelli. Secondly, Federal and Schwartz assert that Straz drove the vehicle

---

1. The Bill of Lading, signed by Schwartz, also provided that Spinelli could make such repairs to the vehicle as may have been necessary during the course of the drive if no one repair exceeded twenty dollars, but any repair in excess of twenty dollars required Schwartz's permission. It so happened that between the time the vehicle was picked up from in front of Schwartz's residence and its delivery to Frank, the water hose burst and a repair of approximately twenty-two dollars was made. The twenty-two dollars was also collected by Spinelli from Frank. Frank also was to obtain reimbursement for that sum from Schwartz when he delivered the car and collected the forty dollars balance. No explanation is contained in the record as to why the expenditure for this item was not first approved by Schwartz.

without the consent, expressed or implied, of Schwartz, and Straz's driving was unauthorized. *Ergo*, Federal argues that it is not responsible for primary coverage and, in fact, is not even responsible for excess coverage.

Judge James F. Couch, Jr. held Allstate responsible for primary coverage, and Market, by virtue of its policy with Allstate, liable to the limits of its policy for any excess. Federal, Judge Couch ruled, is liable for any excess sum, to the limits of its policy, that may be required for settlements or satisfaction of the judgments arising from the personal injuries or property claims if they exceed the combined policy limits of Allstate and Market. Allstate and Federal take issue with the judgment of the trial court, and both have appealed to this Court. We conclude, however, for the reasons stated *infra*, that Judge Couch was substantially correct, and we accordingly affirm the judgment as herein modified.

At the outset of our discussion we note that one of the parties to this litigation filed a "Notice of Intent to Rely Upon Foreign Law", "Uniform Judicial Notice of Foreign Law Act." *See* Courts and Judicial Proceedings Article, §§ 10-501 — 10-507. But, whether the case is governed by the law of the State of New York, *i.e.*, where the agreement between Spinelli and Schwartz was made; New Jersey, where Federal's policy to Schwartz was "countersigned"; or Maryland, where the accident actually happened, does not present any difficulty. All three of the jurisdictions follow the principle that insurance coverage exists where, as here, the use of the vehicle at the time of the accident was within the scope of the permission granted. *Cohen v. Am. Home Assurance Co.*, 255 Md. 334, 258 A. 2d 225 (1969); *Hanover Insurance Co. v. Miesemer*, 42 Misc. 2d 881, 249 N.Y.S.2d 87 (1964); *Indemnity Ins. Co. v. Metropolitan Cas. Ins. Co. of N.Y.*, 33 N. J. 507, 166 A. 2d 355 (1960).

Federal argues that its policy does not provide coverage because Straz was operating the Schwartz vehicle without the permission of Schwartz, the named insured. It points to the terms of its policy, which in pertinent part provides:

"1. The first paragraph of 'Persons Insured' is amended to read: Persons Insured

The following are insureds under Part 1:

(a) with respect to the owned automobile,

 (1) the named insured and any resident of the same household,

 (2) *any other person using such automobile with the permission of the named insured, provided his actual operation of (if he is not operating) his other actual use thereof is within the scope of such permission,* and

 (3) any other person or organization but only with respect to his or its liability because of acts or omissions of an insured under (a) (1) or (2) above; . . ."

The policy further provided:

"If the insured has other insurance against a loss covered by Part 1 of this policy, the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance with respect to a temporary substitute automobile or non-owned automobile, shall be excess insurance under any other valid and collectible insurance."

Federal reads the above quoted language to mean that it is not responsible as either primary or excess carrier.

We, however, agree with Allstate that Federal afforded coverage to Frank and Straz because both were "permissive" drivers. Frank's permission was obtained by implication as a

result of the Bill of Lading signed by Schwartz, while Straz's authority to drive Schwartz's vehicle is derived through Frank. Frank's grant of authority to Straz conferred upon Straz the permission necessary to bring Straz within Federal's coverage. In *Maryland Indem. Ins. v. Kornke,* 21 Md. App. 178, 319 A. 2d 603 (1974) we discussed a situation wherein a minor son was given permission by his father to operate the father's automobile. The father specifically forbade his son's allowing anyone else to drive the car. The son was injured in an attempt to fix the motor vehicle, and he, notwithstanding his father's admonition relating to someone else's driving the car, allowed Lynanne Hampshire to drive. While operating the vehicle, Miss Hampshire struck a bridge abutment. Maryland Indemnity maintained that Nationwide, Miss Hampshire's insurance carrier, was primarily responsible because Miss Hampshire was operating the Kornke vehicle without the expressed or implied permission of the owner. It contended that Mr. Kornke's instructions to his son that no one else drive the car other than the son precluded coverage by Maryland Indemnity. Judge Moore, speaking for this Court, said at 191 -192:

> "From our review of Court of Appeals decisions dealing with the construction of omnibus clauses and with appropriate deference to United States District Court decisions making 'informed predictions' as to future Maryland appellate rulings, we conclude that in Maryland:
>
> (1) Where coverage is extended by the omnibus clause only to persons using the vehicle with the permission of the named insured (or other designated person) coverage depends upon the scope of the permission granted.
>
> * * *
>
> (6) Nevertheless, the thrust of Maryland decisions is that in determining whether

> the operation is within the permission required by the omnibus clause 'one must examine the total facts,' and the facts of paramount significance respecting a clause for permitted use (as against permitted operation) do not pertain to the identity of the driver but to whether at the time of the accident the operation of the car was for a *purpose* germane to the permission granted, whether it was for the *convenience* of the named insured or the first permittee, and whether the latter was *present* in the car at the time of the accident."

The construction placed by Judge Moore upon the automobile insurance policy omnibus clause is supported by *Melvin v. American Auto. Ins. Co.*, 232 Md. 476, 194 A. 2d 269 (1963) and *Casualty Co. v. Mitnick*, 180 Md. 604, 26 A. 2d 393 (1942). In the latter case, Chief Judge Bond, for the Court of Appeals, said that "using a car in the ordinary acceptation of the words seems clearly to include a borrower's making use of it by riding while driven by another." *See also* 7 Am.Jur.2d *Automobile Insurance* § 117, where it is stated:

> "The 'general rule' that a permittee may not allow a third party to 'use' the named insured's car has generally been held not to preclude recovery under the omnibus clause where (1) the original permittee is riding in the car with the second permittee at the time of the accident, or (2) the second permittee, in using the vehicle, is serving some purpose of the original permittee. The courts generally reason that under such circumstances the second permittee is 'operating' the car for the 'use' of the first permittee and that such 'use' is within the coverage of the ominbus clause. While some courts apparently would limit this qualification of the general rule to situations where the named insured has not specifically forbidden driving by a

third person, it is more generally held that operation by a third person under such circumstances falls within the protection of the omnibus clause even where such operation is specifically forbidden by the named insured." (Footnotes omitted).

Judge Moore, after examining the "total facts" in *Kornke*, opined at 193:

". . . [T]hat William, Jr. was still 'using' his father's car, even though Lynanne Hampshire was driving the car at the time of the accident, and that the 'actual use' was with the permission of William, Sr. Certainly, at the time of the accident, the operation of the car by the second permittee [Miss Hampshire] was for a purpose germane to the permission granted by father to son; it was, at the very least, for the convenience of the first permittee [the son] (if not, indeed, a matter of necessity in the light of the son's testimony), and, of course, the first permittee [the son] was present in the car at the time of the accident."

The instant case is analogous on its facts to *Md. Indem. Ins. v. Kornke, supra*. Spinelli was authorized to ship the car. Schwartz knew that a driver would be retained to drive the vehicle to Florida, and, by the terms of the Bill of Lading, he authorized a person selected by Spinelli, who happened to be Frank, to drive the car. Frank was present in the vehicle while Straz was driving. Although Schwartz now says that he had a verbal understanding with Spinelli's representative that only one person would drive the vehicle, the Bill of Lading is silent as to such a provision. Moreover, Schwartz's statement is categorically denied by the Spinelli employee who picked up the car from Schwartz. The Bill of Lading allows persons other than the contract driver to be in the car. In clear and unambiguous language the Bill of Lading provides:

"(1) The owner consents that the driver may

> transport persons authorized by the carrier but not for hire. Subject to the terms and conditions published herein."

We have perused the terms and conditions of the Bill of Lading and fail to find any prohibition relative to persons in the vehicle other than "for hire". We think the above quoted proviso of the Bill of Lading obviously places a shipper on notice that others may be in the car and gives rise to a strong inference that the other person may even drive the car.

We do not observe anything in the facts of this case that would remove Straz from the category of a permissive driver. The use being made of the Schwartz car at the time of its involvement in the collision was within the scope of the permission granted by Schwartz. *Cohen v. Am. Home Assurance Co., supra.* We are persuaded that Straz's operation of Schwartz's vehicle was in keeping with Schwartz's purpose, that being the transportation of the car to Florida.

Federal further argues that Spinelli was engaged in the "automobile business" and that Federal's policy specifically excludes coverage for such use. It points to the case of *Midwest Mutual Ins. Co. v. Federal Ins. Co. of N.J.*, 289 So. 2d 760 (Fla. App. 1974), *cert. denied*, 289 So. 2d 760 (1974) to support its contention. While *Midwest, supra*, held a drive-away operation to be an "automobile business", we are not persuaded by the opinion in that case. "Automobile business", as defined by Federal in its policy, "means the business or occupation of selling, repairing, servicing, storing or parking automobiles." Spinelli's business of *transporting* automobiles does not, as we see it, fall within Federal's own definition.

We, therefore, hold that Federal is responsible under the terms of its policy for the negligence, if any, of Straz. Ordinarily, under the rationale of *Maryland Indem. Ins. v. Kornke, supra*, Federal would be deemed to be the primary carrier, but the interposition of the ICC Rules and Regulations causes us to view the matter in a different light.

Judge Couch reasoned that " . . . Federal law is applicable for the determination of rights and obligations of the respective insurers." The trial judge patently was guided by *Tudor Arms Apts. v. Shaffer*, 191 Md. 342, 62 A. 2d 346 (1948); *Hettleman v. Frank*, 136 Md. 351, 110 A. 715 (1920); and *Barsallo v. Barsallo*, 18 Md. App. 560, 308 A. 2d 457 (1973), in which it has been held that the courts of this State shall take judicial notice of the Acts of Congress and the rules and regulations of the Federal agencies. In *Hettleman, supra,* the Court of Appeals quoted from 26 R.C.L. 1430 wherein it is said:

> "It may be laid down as a general rule, deducible from the cases, that whenever, by the express language of an Act of Congress, power is entrusted to either of the principal departments of government to prescribe rules and regulations for the transaction of business in which the public is interested, and in respect of which they have a right to participate, and by which they are to be controlled, the rules and regulations prescribed in pursuance of such authority become a mass of that body of public records of which the courts take judicial notice. Such regulations cannot be questioned or defined, because they may be thought unwise or mistaken; and are regarded as having the force of law."

The Interstate Commerce Act [2] provides in § 315:

> "No certificate or permit shall be issued to a motor carrier or remain in force, unless such carrier complies with such reasonable rules and regulations as the Commission shall prescribe governing the filing and approval of surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, in such

---

**2.** Part II of the Interstate Commerce Act. Feb. 4, 1887, c. 104, Pt. II, § 201, as added Aug. 9, 1935, c. 498, 49 Stat. 543, and amended Sept. 18, 1940, c. 722 Title I, § 15, 54 Stat. 919.

reasonable amount as the Commission may require, conditioned to pay, within the amount of such surety bonds, policies of insurance, qualifications as a self-insurer or other securities or agreements, any final judgment recovered against such motor carrier for bodily injuries to or the death of any person resulting from the negligent operation, maintenance, or use of motor vehicles under such certificate or permit, or for loss or damage to property of others. . . . The Commission may prescribe, with respect to motor carriers operating within the United States in the course of engaging in transportation between places in a foreign country or between a place in one foreign country and a place in another foreign country, such reasonable regulations concerning security for the protection of the public as the Commission is authorized, by this section, to prescribe for other motor carriers." [3]

In order to comply with the Rules and Regulations of the ICC, Spinelli was required to demonstrate that he possessed the requisite insurance coverage. He obtained from Allstate an endorsement on the policy issued to him. The endorsement is entitled, "ENDORSEMENT FOR MOTOR CARRIER POLICIES OF INSURANCE FOR AUTOMOBILE BODILY INJURY AND PROPERTY DAMAGE LIABILITY UNDER SECTION 215 OF THE INTERSTATE COMMERCE ACT." [4] The endorsement reads in pertinent part:

"Within the limits of liability . . . provided it is further understood and agreed that *no condition, provision, stipulation, or limitation contained in the policy, or any other endorsement thereon or violation thereof, or of this endorsement, by the*

---

**3.** Enacted by the 74th Congress, Sess. 1, Ch. 498, August 9, 1935 as § 215, "Security for the Protection of the Public", as part of the "Motor Carrier Act, 1935". It is now codified as Part II, Interstate Commerce Act. It may be found at 49 U.S.C.A. § 315.
**4.** *See* n. 3.

*insured, shall relieve the Company from liability* hereunder or from payment of any such final judgment. . . ." (Emphasis supplied).

The United States Court of Appeals, Tenth Circuit, in *Argonaut Insurance Co. v. National Indemnity Co.*, 435 F. 2d 718 (1971), had before it a case similar to the instant matter. There, Argonaut issued a liability policy to Auto Driveaway Company whose business was to transport motor vehicles from one location to another. National Indemnity issued a policy to Executive Car Leasing Company which was engaged in the business of leasing cars to the public. Both policies, as in the instant case, were in force at the time of the accident. One Nancy Blankenship, through arrangements made with Driveaway, took possession of a motor vehicle owned by Executive in order to transport it to Los Angeles. While en route to her destination, she disobeyed a stop sign in Oklahoma and collided with another car. The motorist in that car sustained fatal injuries. The decedent's estate sued both Driveaway and Blankenship. Executive's insurer refused to defend. Argonaut defended the case and ultimately made a settlement of fifty-five thousand dollars. Argonaut then sued National Indemnity in the belief that National, being the insurer of the automobile being driven by Blankenship, was responsible for primary coverage. The Court said at 720-721:

"Blankenship had possession of the car under authority from Driveaway and drove negligently. The ICC endorsement [which endorsement is identical to that in the case now before us], although not expressly referring to the 'other insurance' provisions, says that no condition, provision, stipulation, or limitation of the policy 'shall relieve the Company [the insurer] from liability hereunder.' If the Argonaut position is accepted, it will be relieved from any liability except for excess coverage. We believe that the effect of the endorsement was to make Argonaut the primary insurer.

> Whatever may be the liability of National under its policy, we agree with the trial court that '. . . Argonaut escape the plain terms of its insuring agreement in this case.' The ICC endorsement imposes primary liability and eliminates any need for consideration of the effect of the identical 'other insurance' clauses. We have no question of excess because the recovery was within the limits of the Argonaut policy."

The *Argonaut* decision has been followed in *Aetna Casualty and Surety Company v. Arkin*, 365 F. Supp. 813 (N.D. Ill. 1973) and *Hagans v. Glens Falls Insurance Co.*, 465 F. 2d 1249 (10th Cir. 1972). We are persuaded that the reasoning of *Argonaut* is sound, and we adopt it. In so doing, we expressly reject the rationale of *Marwell Const., Inc. v. Underwriters at Lloyd's, Lon.*, 465 P. 2d 298 (Alaska, 1970), *National Mutual Ins. Co. v. Liberty Mutual Ins. Co.*, 196 F. 2d 597 (1952), and *American Fidelity & Cas. Co. v. Pennsylvania Cas. Co.*, 97 F. Supp. 965 (1950), relied upon by appellant, and which hold to the contrary. Moreover, we think that *Carolina Casualty Insurance Company v. Transport Indemnity Company*, 488 F. 2d 790 (10th Cir. 1973), also relied upon by Allstate, to be factually inapposite. There the court was concerned with two ICC endorsements and the relative position of each carrier with respect to liability. The court suggested, however, that its decision was predicated upon an attempt to avoid circuity of actions.

Under Allstate's theory of the coverage afforded by its policy, the only exposure to which it would ever be subjected, insofar as transporting vehicles of another is concerned, would be that of an excess carrier. It would never provide primary coverage because it would always be in a position to contend successfully that the vehicle was insured by another company even though it was being transported by Allstate's insured. We think, however, that such a theory is unsound and is in conflict with the endorsement contained in its policy to Spinelli as well as with Section 215. In our view the intent of Congress and the ICC was that the

insurance company which wrote the ICC endorsement would be responsible for primary coverage, both as a matter of law and of public policy. *Aetna Casualty and Surety Company v. Arkin, supra.*

Paraphrasing Mr. Justice Jackson, dissenting, in *United States ex rel. Marcus v. Hess*, 317 U. S. 537, 557, 63 S. Ct. 379, 391, 87 L. Ed. 443, 456 (1943), if ever we were justified in reading a required endorsement in an insurance policy, ICC rule and statute, not narrowly as through a keyhole, but in the broad light of the evils at which they are aimed and the protection they seek to accomplish, it is here.

*Hagans, supra,* follows "the teaching of Argonaut" that the ICC endorsement on an insurance policy makes the company issuing the endorsement responsible for primary coverage both as a matter of law and public policy.

Although Spinelli's policy from Allstate was written in limits of $50,000 to each person arising out of each accident and $100,000 each accident, the ICC endorsement limited liability to $25,000 each person and $100,000 each accident. We hold, therefore, that Allstate, because of the ICC endorsement, is the primary coverage insurer to the extent of $25,000 per person and $100,000 per accident.

As we have previously stated, under the rationale of *Maryland Indem. Ins. v. Kornke, supra,* Federal would be the primary carrier, and it is only the ICC endorsement that projects Allstate into the primary position ahead of Federal. Federal is then relegated to the second position immediately behind Allstate's ICC coverage of $25,000/$100,000.[5] If

---

**5.** The Court of Appeals in Consol. Ins. Co. v. Bankers Ins. Co., 244 Md. 392, 223 A. 2d 594 (1966) dealt with "Other insurance" clauses. They said at 396:

"In cases where two or more of these 'other insurance' clauses conflict, most courts resolve the problem of double coverage by attempting to reconcile the conflicting clauses. This Court has followed this approach. *Celina Mutual Casualty Co. v. Citizens Casualty Co.,* 194 Md. 236, 71 A. 2d 20, 21 A.L.R.2d 605 (1949); *Citizens Casualty Co. of N.Y. v. Allied Mutual Ins. Co.,* 217 Md. 494, 144 A. 2d 73 (1958); *Zurich Insurance Co. v. Continental Casualty Co.,* 239 Md. 421, 212 A. 2d 96 (1964). . . ." (Footnote omitted).

The Court went on to state at 399:

"Where an excess clause and a pro-rata clause appear in

Federal's policy limits are then exceeded by way of settlement or judgment, Allstate reenters the matter as an excess carrier to the extent of its original policy limits, less payment made to any one person or one occurrence under the ICC endorsement limit. Market is responsible to the extent of its policy limits for all settlements or judgments that exceed the Allstate, Federal, Allstate policies. To recapitulate, we hold that each insurance carrier is liable in the order and amount as follows:

1. Allstate is the primary carrier, under the ICC endorsement, for all settlements or judgments to the policy limits of $25,000 each person, $100,000 each occurrence.
2. Federal is then liable for excess, to the extent of its policy limits.
3. Allstate, as an excess carrier, is then responsible to the extent of its unused policy proceeds, if any.
4. Market as an excess carrier is responsible, to the extent of its policy limits, for any recovery by way of settlements or judgments over and above the combined coverage of Allstate and Federal as set forth in 1, 2 and 3 above.

> *Judgment modified and, as modified, affirmed.*
>
> *Costs to be paid: one-half by appellants — cross-appellees, Allstate Insurance Company and Market Insurance Company; one-half by appellee — cross-appellant, Federal Insurance Company.*

---

concurrently effective automobile liability policies, the majority of courts have disregarded the pro-rata clause and given full effect to the excess clause, making that insurer the 'excess' insurer only."

The Court held that "in a conflict between an excess clause and a pro-rata clause, the excess clause" controls.

In the instant case there is a conflict between the pro-rata clause and the excess clause of the Federal policy. The conflict is brought about largely because of the ICC endorsement in the Allstate policy. Therefore, under the case of Consol. Ins. Co. v. Banker, *supra*, the excess clause, not the pro-rata clause, controls.