699 A.2d 482

**EMPIRE FIRE AND MARINE INSURANCE COMPANY**

v.

**LIBERTY MUTUAL INSURANCE COMPANY.**

**No. 1591, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Sept. 3, 1997.*

---

\* Editor's Note: A June 26, 1997 opinion was previously published at 116 Md.App. 143, but was withdrawn after reconsideration was granted in part.

74

78

---

Catherine A. Potthast (Smith, Somerville & Case, L.L.C., on the brief), Baltimore, for Appellant.

Roy W. Anderson, Jr. (Kristen H. Woolam and Law Offices of J. Owen Bracken, Jr., on the brief), Baltimore, for Appellees.

Argued before WENNER and HARRELL, , JJ., and JOHN J. BISHOP, Judge (retired), Specially Assigned.

HARRELL, Judge.

This case was decided initially by the Court on 26 June 1997. Both parties filed motions for reconsideration. We shall grant in part and deny in part those motions. Such revisions to the previously filed opinion, which has been recalled, necessary to effect those parts of the motions as we have granted are included in the following opinion. Those revisions do not change, however, the decision on the merits of the issues; they reflect merely clarifications of our reasoning.

Before us is yet another insurance coverage dispute stemming from an accident involving equipment leased to a carrier sanctioned by the former Interstate Commerce Commission. Empire Fire and Marine Insurance Company (Empire) appeals from a judgment of the Circuit Court for Baltimore County in a declaratory judgment proceeding in which the court concluded that Empire was obligated, under a policy it issued to James Perry, Jr. d/b/a J.P. Transportation to defend or indemnify for claims arising out of a motor tort case. Empire challenges the circuit court's conclusion that a truck driven by Mr. Perry was not operating in the business of O.S.T. Trucking Co., Inc. (O.S.T.), to whom the covered vehicle was leased, thereby preventing the application of a "business use" exclusion contained in the policy Empire issued to Mr. Perry. In addition, appellant claims that the court erred by not holding that appellee, Liberty Mutual Insurance Company (Liberty), was not obligated to provide coverage. Empire asserts that, based on a permissive use clause contained in a policy Liberty issued to O.S.T., Liberty was obligated to provide coverage for the vehicle leased to O.S.T. and being driven by Mr. Perry, the vehicle's owner.

We agree with the circuit court's holding that, at the time of the accident, the truck was not being operated in the business of O.S.T.. Because the circuit court failed to consider whether Liberty was obligated to provide coverage under its permissive use provision and because the record does not contain

sufficient undisputed facts from which such a determination can be made, however, we must reverse the judgment of the circuit court and remand this case for further proceedings. In remanding this case, we shall offer the trial court some guidance for determining whether the permissive use provision applies and in reconciling the potential dual coverage issues.

## ISSUES

In order to facilitate our analysis of the instant appeal, we have reordered and rephrased the questions presented by appellant as follows:

I. Whether the Peterbuilt tractor driven by James Perry, Jr. was being used in the business of O.S.T. at the time of the accident.

II. Whether Mr. Perry is an insured under a permissive use provision contained in an insurance policy issued by Liberty to O.S.T.

III. Whether Empire's policy furnishes primary liability.

IV. Whether Liberty's policy furnishes primary liability.

V. If both policies furnish primary liability, how should the two policies' "other insurance clauses" be reconciled.

## FACTUAL BACKGROUND

In the proceedings before the circuit court, the parties submitted an agreed statement of fact and exhibits. We have excerpted the relevant portions of that statement below.

James Perry, Jr. is the owner and operator of a 1986 Peterbuilt Tractor.... Mr. Perry owned the subject tractor in January 1995. Mr. Perry would haul trailers owned by other entities at the request of [O.S.T.]. Mr Perry did business under the trade name "J.P. Transportation".

In January 1995, the subject tractor was under lease with [O.S.T.].[ [1] ] [O.S.T.] was in the business of hauling loads of

---

1. Mr. Perry and O.S.T. entered into the lease in question on 22 March 1994. The lease had a term of one year.

freight.... As stated in the lease, Mr. Perry cannot pick up or deliver trailers for another entity without [O.S.T.'s] prior permission. [O.S.T.] is a licensed I.C.C. [Interstate Commerce Commission] carrier operating under an I.C.C. permit.... In January 1995, the subject tractor was operated with an adhesive I.C.C. placard affixed, bearing the I.C.C. and D.O.T. [Department of Transportation] Permit Numbers assigned to [O.S.T.].

Mr. Perry was not employed by [O.S.T.], but was instead considered an independent trucker. [O.S.T.] did not withhold taxes or social security from payments made to Mr. Perry.

With regard to scheduling trucking assignments, Mr. Perry contacts the [O.S.T.] dispatch office on a daily basis to obtain his next assignment. The arrangement is described by Mr. Perry as a "non-force dispatch," ... [meaning that O.S.T] cannot force Mr. Perry to carry a load involuntarily. Mr. Perry is compensated for each trip by [O.S.T.] Trucking in accordance with a designated standard mileage rate. All repairs and maintenance to [Mr. Perry's] truck are the responsibility of Mr. Perry. Any needed repairs and maintenance to [Mr. Perry's] truck were arranged by Mr. Perry. Mr. Perry assumed the cost of all fuel, repairs and maintenance to his vehicle, and was not reimbursed for those expenses....

\* \* \*

The accident which is the subject of the underlying case occurred in the late afternoon on Friday, [20 January 1995]. Mr. Perry was last under dispatch by [O.S.T.] on Monday, [16 January 1995], when he was dispatched to take an empty trailer to Bayonne, New Jersey from Baltimore; and was instructed to bring back a load to Baltimore. On the return trip from Bayonne, New Jersey, Mr. Perry began experiencing mechanical problems with the tractor concerning a pressure plate (related to the transmission). The mechanical problem did not render the tractor inoperable.

Mr. Perry returned to Baltimore on Monday evening, [16 January 1995] and delivered the full trailer to a warehouse in Baltimore. After completing this dispatch which had been given by [O.S.T.], Mr. Perry took the tractor without any trailer attached for repairs.

By Tuesday, [17 January 1995], Mr. Perry had taken the tractor to Chuck's Fleet Service on North Point Road in Baltimore for repair of the pressure plate. The tractor remained in the shop throughout Wednesday, Thursday and Friday, i.e., [18, 19, 20 January].

By the late afternoon hours on Friday, [20 January], the repairs had been completed; and Mr. Perry retrieved the tractor from Chuck's Fleet Service at approximately 4 or 5 p.m.. Mr. Perry paid for the repairs, and was not reimbursed by [O.S.T.].

Mr. Perry had spoken with the dispatch office of [O.S.T], and anticipated his next dispatch by [O.S.T.] to be on Monday, [23 January].

Approximately two weeks earlier, Mr. Perry had ordered parts from Beal's GMC Peterbuilt dealership located on Route 40 East. The Peterbuilt dealership is located in route between Chuck's Fleet Service and Mr. Perry's home. Beal's dealership is the only Peterbuilt dealership in Baltimore furnishing parts for Peterbuilt tractors such as the subject tractor. Mr. Perry recalls that the parts on order were related to a toolbox attached to the exterior of the subject tractor. The toolbox is approximately three feet long, and is located on the side frame of the tractor. The toolbox acts as a step upon which the driver enters and exists the trucking cab compartment, and can be used to store tools or other belongings. Mr. Perry believes that the parts on order were for a lock for the toolbox and possibly a hinge. After retrieving the tractor from Chuck's Fleet Service on Friday, [20 January], Mr. Perry drove into the Peterbuilt dealership, purchased the parts and drove out of the dealership onto Route 40. [O.S.T] did not reimburse Mr. Perry for these parts. The accident that is the subject of the underlying case then occurred on Route 40.

Mr. Perry was not en route to pick up or deliver a trailer at the time of the accident. Mr. Perry was not receiving any compensation by [O.S.T] from [17 January 1995—Friday 20 January 1995]. At the time of the accident, Mr. Perry was on his way home. At the time of the accident, Mr. Perry was not operating under a bill of lading. The tractor was not under dispatch. Mr. Perry was not hauling a load, and the tractor was not connected to a trailer. Mr. Perry was bobtailing[2] when the accident occurred. (Operating a tractor unattached to a trailer is commonly referred to as "bobtailing"). Mr. Perry was "off-duty" [17 January through 20 January 1995, inclusive], the day of the accident. Mr. Perry did not believe that he was within the control of [O.S.T.] at the time of the accident, nor operating the tractor pursuant to [O.S.T.] instructions.

(Footnote omitted).

### THE PERRY/O.S.T. LEASE

On 22 March 1994, Mr. Perry and O.S.T. entered into a one-year written motor vehicle lease and agreement. The lease included the following terms:

... O.S.T. shall adhere to and perform said provisions and Independent [Mr. Perry] will operate the Equipment as the business of O.S.T. may require, and perform such other

---

2. Bobtailing refers to the operation of a tractor without an attached trailer. *See, e.g., Hartford Ins. Co. v. Occidental Fire & Cas. Co.*, 908 F.2d 235, 236 n. 2 (7th Cir.1990); *Nationwide Mut. Ins. Co. v. Holbrooks*, 187 Ga.App. 706, 371 S.E.2d 252, 255 (1988); *St. Paul Fire & Marine Ins. Co. v. Frankart*, 69 Ill.2d 209, 13 Ill.Dec. 31, 370 N.E.2d 1058 (1977); *National Indem. Co. v. Ness*, 457 N.W.2d 755, 757 (Minn. App.1990); *Blackmer v. Travelers Indem. Co.*, 110 Misc.2d 704, 705, 442 N.Y.S.2d 923, 925 (Sup.1981); *Reeves v. B. & P. Motor Lines, Inc.*, 82 N.C.App. 562, 346 S.E.2d 673, 675 (1986); *Midwestern Indem. Co. v. Reliance Ins. Co.*, 44 Ohio App.3d 83, 541 N.E.2d 478, 481–82 (1988), *appeal dismissed*, 43 Ohio St.3d 610, 539 N.E.2d 628 (1989). For the uninitiated, "bobtailing" should not be confused with "deadheading" which refers to the operation of a tractor-trailer when the trailer is empty. *See Central Nat'l Ins. Co. v. Liberty Mutual Ins. Co.*, 685 F.Supp. 123, 126 (D.S.C.1988); *Frankart, supra; Grimes v. Nationwide Mut. Ins. Co.*, 705 S.W.2d 926, 928 (Ky.App.1985); *Ness, supra*.

services herein stated for and in behalf of O.S.T., subject to the following terms and conditions.

* * *

3. INSURANCE. O.S.T. shall maintain insurance for the protection of the public as required by the Interstate Commerce Commission while Independent is operating in the business of O.S.T., except Independent agrees to pay $500.00 for damage to property, caused by accident arising out of the use of said tractor in the business of O.S.T, which O.S.T. is obligated to pay any third person. During the term of this agreement, the Independent agrees to provide and maintain, at his sole expense, with O.S.T. as an additional named insured, public liability and property damage insurance ... covering bodily injury, sickness or disease, including death, and damages to property, caused by accident and arising out of the use of said tractor when not being used in the business of O.S.T., as for example, when the tractor is not pulling a trailer or container/chassis for O.S.T., including so-called "bob-tail" insurance.

4. MAINTENANCE. Independent warrants that said tractor, including all additions, accessories, and equipment, are in good safe operating and mechanical condition; and in such condition as to comply with all rules and regulations of the Department of Transportation and with applicable statutes and administrative agency rules of any State in effect where such vehicle is operated; and Independent agrees to keep said tractor in such condition at his own expense for the duration of this lease.

* * *

8. USE OF LEASED EQUIPMENT. As required by [ICC] regulations during the term of this lease, said tractor shall be used exclusively by O.S.T. and for no other person, firm or corporation, when engaged in the transportation of freight, and no freight will be transported by means of said tractor without the knowledge and consent of O.S.T.. Independent will be entitled to no payment from O.S.T. for any

transportation rendered unless the conditions of this paragraph are strictly observed by Independent.

\* \* \*

14. RESPONSIBILITY TO PUBLIC AND REGULATORY AGENCIES: ... Independent agrees to comply fully with all applicable federal and state laws, rules, regulations and orders as well as all O.S.T. procedures ... respecting the operation, inspection and maintenance of vehicular equipment hereunder....

### THE EMPIRE POLICY

■ Mr. Perry obtained a non-trucking use insurance policy from Empire that provided for bodily injury and property damage coverage of $100,000. Essentially, a non-trucking use, or "bobtail," insurance policy is intended to cover the insured when the vehicle is not being operating in the business of an I.C.C. carrier-lessee. The Empire policy contained the following provisions:

\* \* \*

### SECTION II LIABILITY COVERAGE FOR NON-TRUCKING USE
### A. COVERAGE

\* \* \*

### 1. WHO IS AN INSURED
The following are "insureds":

a. You for any covered "auto"

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

(1) The owner or anyone else from whom you hire or borrow a covered "auto."

\* \* \*

### B. EXCLUSIONS

This insurance does not apply to any of the following:

\* \* \*

## 13. BUSINESS USE

"Bodily injury" or "property damage" while a covered "auto" is used to carry property in any business or while a covered "auto" is used in the business of anyone to whom the "auto" is leased or rented.

\* \* \*

## SECTION IV—CONDITIONS

\* \* \*

## B. GENERAL CONDITIONS

\* \* \*

## 5. OTHER INSURANCE

a. For any covered "auto" you own, this policy provides primary insurance. For any covered "auto" you don't own, the insurance provided by this policy is excess over any other collectible insurance.

### *THE LIBERTY POLICY*

O.S.T. obtained insurance through Liberty, which issued a business automobile insurance policy that furnished liability coverage of $1,000,000 for covered "autos." Liberty's policy contained the following pertinent provisions:

\* \* \*

## SECTION II—LIABILITY COVERAGE

## A. COVERAGE

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto."

\* \* \*

## 1. WHO IS AN INSURED

The following are "insureds":

a. You for any covered "auto":

b. Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

(1) The owner or anyone else from whom you hire or borrow a covered "private passenger type auto".

\* \* \*

d. The owner or anyone else from whom you hire or borrow a covered "auto" that is not a "trailer" while the covered "auto":

(1) is being used exclusively in your business as a "trucker"; and

(2) is being used pursuant to operating rights granted to you by a public authority.

\* \* \*

### SECTION V—TRUCKERS CONDITIONS

\* \* \*

## B. GENERAL CONDITIONS

\* \* \*

## 5. OTHER INSURANCE—PRIMARY AND EXCESS INSURANCE PROVISIONS

\* \* \*

a. This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority. This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from you by another "trucker". . . .

f. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of Our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis

\* \* \*

## SECTION VI—DEFINITIONS

\* \* \*

N. "Trucker" means any person or organization engaged in the business of transporting property by "auto" for hire.

In addition, Liberty's policy had an MCS–90 Endorsement[3] attached to it, stating in relevant part:

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer . . . agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance, or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded for public liability does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo.

It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement thereon, or violation thereof, shall relieve the Company from liability or from the payment of any final

---

**3.** The MCS–90 Endorsement is explained in greater detail, *infra*, at 93–95.

judgment, within the limits of liability herein deserved, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which this endorsement is attached shall remain in full force and effect as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

\* \* \*

This insurance is primary and the company shall not be liable for amounts in excess of $1,000,000.00 for each accident. . . .

### PROCEDURAL HISTORY

This litigation involves two actions: 1) the underlying action by the injured party against the lessor, lessee, and driver; and 2) a second action for declaratory judgment between the insurers to determine which insurer is financially responsible for the loss. The issues presented by this appeal stem from the latter action. On approximately 24 January 1996, Patrick Lauer filed suit in the Circuit Court for Baltimore County seeking recovery for injuries he allegedly sustained in the 20 January 1995 accident with Mr. Perry's truck. In his pleadings, Mr. Lauer named, *inter alia*, Mr. Perry, J.P. Transportation, and O.S.T. as defendants. A coverage dispute arose between Liberty and Empire, the companies that issued policies to O.S.T. and Mr. Perry, respectively. Consequently, on 6 March 1996, Empire filed a declaratory judgment action in the Circuit Court for Baltimore County seeking a declaration that, under the nontrucking policy it issued to Mr. Perry, either (1) it was not obligated to defend or indemnify for claims asserted in the suit filed by Mr. Lauer; (2) if its policy did provide coverage, that it was excess to the Liberty policy;

or (3) if the Empire and Liberty policies both provided primary coverage, that Liberty reimburse Empire for its prorated share of defense costs and any indemnity to be furnished. Pending the outcome of the declaratory judgment action, Empire agreed to provide a defense to the named defendants.

The insurers filed cross-motions for summary judgment. After a hearing conducted on 14 August 1996, the court issued a "Ruling on Cross Motions for Summary Judgment" docketed on 22 August. The court held that Empire's non-trucking policy was the sole policy that afforded coverage in the underlying motor tort action. In so holding, the court reasoned as follows:

> At the time of the accident, the tractor was not being used "in the business of" O.S.T. Perry was not operating the tractor in the business of O.S.T. because: Perry was not under dispatch at the time of the accident, and had not been for four days; Perry's next dispatch was not until three days later; Perry was not hauling a load for O.S.T., and the accident occurred when Perry was on his way home for [sic.] purchasing some minor parts for the tractor's toolbox which he had ordered two weeks previously.

A timely notice of appeal followed.

## ANALYSIS

### I.

■■ We begin our analysis by attempting to understand and explain the labyrinth of applicable federal regulations governing the interstate trucking industry applicable to this case. Pursuant to the ICC Termination Act of 1995,[4] the existence of the Interstate Commerce Commission (I.C.C.) ended effective 1 January 1996. Section 204(c) of the Act

---

4. The ICC Termination Act of 1995 abolished the Interstate Commerce Commission and established the Surface Transportation Board within the Department of Transportation. Pub. Law 104–88, 109 Stat. 803, 29 December 1995. See 49 U.S.C. § 13906 et seq. We are confident this action makes sense to someone.

provides that suits commenced before its enactment were subject to the law in effect prior to the sunset of the I.C.C. Unfortunately, the statute does not address causes of action, such as that encompassed by the instant litigation, which accrued prior to the Act's enactment but for which suit was not filed until after its enactment. Notwithstanding this hole in the regulatory fabric, pursuant to a savings provision contained in Section 204 of the Termination Act,[5] the rules and regulations promulgated by the I.C.C. continue in effect until revised or revoked by parties designated in the Act's savings provision.[6] As such, despite the demise of the I.C.C., the relevant law remains essentially the same. As our final tribute to the I.C.C., throughout the balance of this opinion we shall refer to the regulations governing the interstate trucking industry as the "I.C.C. regulations." [7]

The I.C.C. regulations governing leases of vehicles to carriers sanctioned by the I.C.C. can be traced to an early study concluding that the use by Commission-authorized motor carriers of leased vehicles led to several problems and abuses including avoidance of Commission safety requirements; the difficulty of establishing the lessee's responsibility for accidents; and a general circumvention of the regulatory scheme. *See American Trucking Ass'ns v. United States*, 344 U.S. 298,

---

**5.** The provision provides that

all orders, determinations, rules and regulations (1) that have been issued, made, granted, or allowed to become effective by the Interstate Commerce Commission, . . . in the performance of any function that is transferred by this Act or amendments made by this Act; and (2) that are in effect on the effective date of such transfer . . . shall continue in effect according to their terms until modified, terminated, superseded, set aside or revoked in accordance with law by the Board, any other authorized official, a court of competent jurisdiction, or operation of law. . . .

**6.** Section 205 of the Act states that any reference to the I.C.C. in federal statutes, rules, or regulations is now deemed to refer to the Surface Transportation Board.

**7.** Prior to 1996, motor carriers of property were regulated by both the ICC and Department of Transportation. The ICC and the Department of Transportation had concurrent regulatory jurisdiction over vehicles weighing 10,000 pounds that transported non-hazardous materials.

302, 73 S.Ct. 307, 310–11, 97 L.Ed. 337 (1953); *Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.*, 868 F.2d 357, 362 (10th Cir.1989).

In the 1950's, it was common practice for trucking companies to attempt to immunize themselves from liability by using independent truck drivers or by denominating the regular drivers as independent contractors. To combat this practice and to ensure that the motoring public was adequately protected, Congress enacted 49 U.S.C. § 11107 (formerly 49 U.S.C. § 304(e)). *See Transamerican Freight Lines Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). The federal statute and the regulations promulgated thereunder protect the motoring public by requiring the trucking company to have control of and to be responsible for the operation of leased vehicles.

*Wilson v. Riley Whittle, Inc.*, 145 Ariz. 317, 701 P.2d 575, 578–79 (App.1984).

Under the ICC regulations, leased vehicles are placed under the responsibility and control of the lessee. *See* 49 C.F.R. § 1057.12(c). The regulations also required that the lease address insurance coverage:

(1) The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to Commission regulations under 49 U.S.C. 10927. The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance. . . .

*Id.* § 1057.12(j). In addition, the regulations prescribed that leased trucks display identifying placards throughout the term of the lease. *Id.* § 1057.11(c). *See generally* Steven J. Kalish, *Almost Everything you Wanted to Know about ICC Leasing Regulations*, 55 Transp. Prac. J. 160 (Winter 1988).

Congress also enacted 49 U.S.C. § 10927 to provide protection for the public by ensuring that I.C.C. carriers were independently financially responsible. *See Ford Motor Co. v.*

*Transport Indem. Co.,* 795 F.2d 538 (6th Cir.1986); *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.,* 569 F.2d 304, 312 (5th Cir.1978); S.Rep. No. 1650, 83d Cong., 2d Sess. 1–2, *reprinted in* 1954 U.S.C.C.A.N. 2658. Pursuant to this statute, the I.C.C. promulgated regulations imposing financial responsibility requirements on motor carriers. Proof of financial responsibility was a prerequisite to obtaining the necessary certification to qualify as an interstate motor carrier. The financial responsibility requirements covered matters such as the type of insurance, the limits of insurance, and a series of mandatory forms with which motor carriers were required to conform. *See* 49 C.F.R. § 1043.1(a)(1). All carriers were required to be able to indemnify damages claims "for bodily injuries to or death of any person resulting from the negligent operation, maintenance or use of motor vehicles in transportation ..., or for loss of or damage to property of others." *Id.* The regulations also prescribed that a certified insurance policy contain an Endorsement for Motor Carrier Policies of Insurance for Automobile Bodily Injury and Property Damage under 49 U.S.C. § 10927. This special endorsement was commonly refereed to as the BMC 90 Endorsement. *Id.,* § 1043.7(a)(3).

In addition, motor vehicles with a gross weight of 10,000 pounds or greater were subject to the Department of Transportation's regulatory jurisdiction. *See* 49 U.S.C. § 31138 *et seq.;* 49 C.F.R. § 387.3(c)(1). Like its I.C.C. counterpart, the DOT regulations prohibited a motor carrier from transporting property unless it had met certain financial responsibility requirements. *Id.* §§ 387.7(a); 387.9. Pursuant to section 30 of the Motor Carrier Act of 1980,[8] the regulations established a minimum level of financial security of $750,000 for vehicles transporting non-hazardous materials. *See id.* § 387.9(1); *see also id.* § 1043.2(b)(2)(A). Further, insurance policies were required to have a mandatory endorsement known as the MCS–90.[9] *See id.* § 387.15. The MCS–90 Endorsement was

---

8. Pub.L. No. 96–296, 94 Stat. 793 (1 July 1980).

9. MCS stands for Motor Carrier Safety.

designed to satisfy the I.C.C.'s regulations and the Department of Transportation regulations simultaneously, obviating the need for obtaining the BMC 90 Endorsement once the MCS–90 Endorsement had been acquired.

Finally, the federal regulations mandated that ICC carriers ensure that all vehicles operating under their permits underwent regular maintenance and repair:

(a) *General.* Every motor carrier shall systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles subject to its control.

(1) Parts and accessories shall be in safe and proper operating condition at all times. . . .

49 C.F.R. § 396.3.

## II.

We turn next to the general rules of construction employed by Maryland courts when construing insurance policies. Insurance is "a contract whereby one undertakes to indemnify another or pay or provide a specified or determinable amount or benefit upon determinable contingencies." Md. Ann.Code, art. 48A, § 2. An insurance policy is "the written instrument in which the contract of insurance is set forth. . . ." *Id.,* § 364. In Maryland, therefore, insurance polices are construed like other contracts. *See, e.g., North River Ins. Co. v. Mayor & City Council of Balto.,* 343 Md. 34, 680 A.2d 480 (1996); *Government Employees Ins. Co. v. Harvey,* 278 Md. 548, 366 A.2d 13 (1976); *see also, Bond v. Pennsylvania Nat'l Mut. Cas. Ins. Co.,* 289 Md. 379, 424 A.2d 765 (1981). Unlike many other types of contracts, however, the construction of insurance policies is also governed by "a few well-established principles," *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985), *ans. confirmed to,* 774 F.2d 94 (4th Cir.1985), that are similar to those used in interpreting a statute. *Travelers Ins. Co. v. Benton,* 278 Md. 542, 365 A.2d 1000 (1976). *Compare Pacific Indem., supra, with Mount v. Mount,* 59 Md.App. 538,

476 A.2d 1175 (1984). In fact, in *Stanley v. American Motorists Ins. Co.*, the Court held that when an insurance policy which apparently has had a nationwide use and has been judicially constructed in many states, the parties to the insurance agreement adopt the policy with the uniform judicial construction accorded. 195 Md. 180, 73 A.2d 1 (1950).

The "first principle of construction of insurance policies in Maryland is to apply the terms of the contract," *Mutual Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 250, 508 A.2d 130, 133 (1986), to determine the scope and limitations of its coverage. *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 656 A.2d 779 (1995); *Lawyers Title Ins. Corp. v. Knopf*, 109 Md.App. 134, 674 A.2d 65, *cert. denied*, 343 Md. 333, 681 A.2d 69 (1996). This principle serves to achieve the touchstone of policy construction—to ascertain and effectuate the intent of the parties to the agreement. *Aragona v. St. Paul Fire & Marine Ins. Co.*, 281 Md. 371, 375, 378 A.2d 1346, 1348–49 (1977); *see Schuler v. Erie Ins. Exch.*, 81 Md.App. 499, 568 A.2d 873, *cert. denied*, 319 Md. 304, 572 A.2d 183 (1990). To divine properly the parties' intent, the policy is viewed as a whole, without emphasis being placed on particular provisions. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995); *Nolt v. United States Fidelity & Guar. Co.*, 329 Md. 52, 617 A.2d 578 (1993); *Simkins Indus., Inc. v. Lexington Ins. Co.*, 42 Md.App. 396, 401 A.2d 181, *cert. denied*, 285 Md. 730 (1979). Moreover, whenever possible, each clause, sentence, or provision shall be given force and effect. *See Pacific Indem, supra; Truck Ins. Exch. v. Marks Rentals, Inc.*, 288 Md. 428, 418 A.2d 1187 (1980); *Gottlieb v. American Auto. Ins. Co.*, 177 Md. 32, 7 A.2d 182 (1939). The nature of the policy, its purpose, and the facts and circumstances surrounding the execution of the insurance agreement are also important considerations in determining the parties' intent. *Pacific Indem.*, 302 Md. at 388, 488 A.2d at 488. Finally, statutes in force at the time the insurance contract was entered into must be read as a part of the contract when construing the terms of the policy. *See Inland Mut. Ins. Co. v. Stallings*, 263 F.2d 852 (4th Cir.1959). The legislative

purpose of such controlling statutes should also be read in conjunction with the agreement. *See Keystone Mut. Cas. Co. v. Hinds*, 180 Md. 676, 26 A.2d 761 (1942) (holding that insurance policy, issued pursuant to a statute forbidding the operation of a motor vehicle until good and sufficient security was given for the protection of the public, be construed together with a statute in light of legislative purpose). Indeed, an insurance contract cannot be enforced as written when there is a statute requiring a different effect. *Vollmer, supra.*

When examining the language of the policy, an "ordinarily and usually accepted" meaning should by accorded to the text, *Aragona*, 281 Md. at 371, 378 A.2d 1346, unless there is evidence that the parties intended to employ the word "in a special or technical sense," *Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766, 556 A.2d 1135, 1138 (1989), or the contract provides a specific definition for the word. *See Valliere v. Allstate Ins. Co.,* 324 Md. 139, 142, 596 A.2d 636, 638 (1991). If the policy "language is unambiguous and plain as to its meaning, construction of the insurance contract is within the province of the courts." *Pacific Indem.,* 302 Md. at 389, 488 A.2d at 488; *Aragona*, 281 Md. at 375, 378 A.2d at 1348. Language is unambiguous when it has only one meaning to a reasonably prudent layperson. *See Marks Rentals, Inc.,* 288 Md. at 433, 418 A.2d at 1190 ("an ambiguity does arise if, to a reasonably prudent layman, the language used is susceptible of more than one meaning").

Unlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer. *Sullins, supra; Travelers Ins. Co. v. Benton,* 278 Md. 542, 365 A.2d 1000 (1976); *Government Employees Ins. Co. v. DeJames,* 256 Md. 717, 261 A.2d 747 (1970). Instead, under Maryland jurisprudence, the ordinary standards of contract construction govern in order to achieve an equitable and just construction. *Gottlieb, supra.* Nevertheless, under general principles of contract construc-

tion, if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument.* *North River Ins. Co. supra; W.M. Schlosser Co. v. Insurance Co. of N. Am.,* 325 Md. 301, 600 A.2d 836 (1992); *Aragona,* 281 Md. at 375, 378 A.2d at 1348–49.[10] The vitality of this rule is in no way compromised when the dispute involves two insurance carriers. *See, e.g., Commercial Standard Ins. Co. v. General Trucking Co.,* 423 So.2d 168 (Ala.1982).

## *III.*

With the aforementioned rules of construction and the pertinent I.C.C. regulations in tow, we shall "keep on trucking"[11] in order to construe the terms of the policies before us in order to determine the respective risks of loss against which Empire and Liberty contracted to insure. *See Fisher v. Tyler,* 284 Md. 100, 394 A.2d 1199 (1978); *McNeill v. Maryland Ins. Guaranty Ass'n,* 48 Md.App. 411, 427 A.2d 1056 (1981). We shall first attempt to ascertain whether, at the time the accident occurred, Mr. Perry was operating the

---

**10.** Students of Latin, such as The Honorable John F. Fader, II, (*see* John F. Fader, II and Richard J. Gilbert, *Maryland Family Law* § 3–1(a), at 55 (2d ed.1995)), might recognize this as the doctrine of *contra proferentum.* The principal rationale for this rule is that, as a matter of fairness, because the insurer prepared the policy, it is just and reasonable that the drafter's own words should be construed against it. *Ebert v. Millers Mut. Fire Ins. Co.,* 220 Md. 602, 155 A.2d 484 (1959). *See generally H.R. Weissberg Corp. v. New York Underwriters Ins. Co.,* 260 Md. 417, 272 A.2d 366 (1971); *Mateer v. Reliance Ins. Co.,* 247 Md. 643, 233 A.2d 797 (1967). Essentially, Maryland courts apply the majority rule, but do so at a different point in the analytical process. Maryland courts first ascertain the intent of the parties from the policy as a whole, considering extrinsic and parol evidence to construe any ambiguity. Only if either no extrinsic or parole evidence is introduced or if an ambiguity still remains after the examination of extrinsic evidence will Maryland courts construe a policy against an insurer. *Sullins, supra; Collier v. MD–Individual Practice Ass'n,* 327 Md. 1, 607 A.2d 537 (1992); *W.M. Schlosser, supra.*

**11.** The phrase is generally attributed to the underground cartoonist, Robert Crumb.

tractor in the business of O.S.T.[12] If we answer in the affirmative, then Empire is not required to furnish coverage pursuant to ¶ II., B., 13. of its policy (Exclusion for Business Use).[13]

 Empire asserts that Mr. Perry's use of the tractor for purposes of arranging for repairs and maintenance and retrieving parts for the tractor was "in the business of" O.S.T., thereby triggering the business use exclusion contained in the policy it issued to Mr. Perry. In construing the phrase "in the business of," [14] we shall follow the course of other courts that have sought guidance from the analogous common law doc-

---

**12.** Generally, policies insuring carriers who lease vehicles from an owner-operator attempt to exclude from coverage an owner-lessor who would otherwise be an insured under a policy's omnibus clause by requiring the lessor's operation to be exclusively *in the business of* the named insured. *See, supra,* at 88 (paragraph II., A., 1, d. of Liberty's policy). The reverse is true for bobtail policies issued to lessors. These policies contain provisions that exclude coverage when the vehicle is used *in the business of* anyone to whom the vehicle is rented. *See, supra,* at 86 (paragraph II., B., 13. of Empire's policy). Because both policies are essentially concerned with the same issue, i.e., whether the leased vehicle was being used in the business of the lessee, we shall only perform this analysis once by analyzing whether Empire's business use exclusion applies.

**13.** *See, supra,* at 86. Empire concedes that Mr. Perry was an "insured" person, that the Peterbuilt tractor he was driving at the time the accident occurred was a covered "auto" as defined in the policy, and that the collision constituted an "accident" for which damages for "bodily injury" or "property damage" are sought.

**14.** No ambiguity is present in Empire's business use exception clause. *See, e.g., Matt v. Hartford Acc. & Indem. Co.,* 212 So.2d 284 (La.App. 1968) (providing that it shall not apply "while the automobile is being used in the business of any person .... to which the automobile is rented" is clear and unambiguous); *Lauritano v. American Fidelity Fire Ins. Co.,* 3 A.D.2d 564, 162 N.Y.S.2d 553 (1957), *aff'd,* 4 N.Y.2d 1028, 177 N.Y.S.2d 530, 152 N.E.2d 546 (1958) (same). Accordingly, we need not interpret this clause against the drafter. *Hartford Ins. Co. v. Occidental Fire & Cas. Co.,* 908 F.2d at 238; *Ayers v. Kidney,* 2 Ohio Misc. 1, 333 F.2d 812, 813 (6th Cir.1964); *Wenkosky v. Protective Ins. Co.,* 698 F.Supp. 1227 (M.D.Pa.1988); *Central Nat'l Ins. Co. v. Liberty Mut. Ins. Co.,* 685 F.Supp. 123 (D.S.C.1988); *Frankart, supra; Brun v. George W. Brown, Inc.,* 56 Misc.2d 577, 289 N.Y.S.2d 722 (1968). *Contra Assicurazioni Generali v. Ranger Ins. Co.,* 64 F.3d 979, 983 (5th Cir.1995).

trine of respondeat superior.[15] Accordingly, we shall consider whether the truck driven by Mr. Perry was under the control of O.S.T. or otherwise furthering the business of O.S.T. at the time of the accident. *See, e.g., Liberty Mut. Ins. Co. v. Connecticut Indem. Co.,* 55 F.3d 1333, 1337 n. 5 (7th Cir.1995) (emphasizing control aspect but also considering furthering business of lessee); *Hartford Ins. Co. v. Occidental Fire & Cas. Co.,* 908 F.2d at 239; *Central Nat'l Ins. Co. v. Liberty Mut. Ins. Co.,* 685 F.Supp. at 126 (applying furthering the business test); *Lime City Mut. Ins. Ass'n v. Mullins,* 83 Ohio App.3d 517, 521–23, 615 N.E.2d 305, 308–09 (1992) (implicitly approving trial court's application of respondeat superior analysis and emphasizing "furthering of the commercial interest" of lessee test).

Appellant cites several decisions from other jurisdictions in support of its contention that Mr. Perry could have been operating the truck in the business of O.S.T. even though he was not pulling a trailer or otherwise under dispatch. Empire argues that the stop at the Peterbuilt dealership was in furtherance of the business of the ICC carrier-lessee, O.S.T. Empire postulates that under the federal regulatory regime, either O.S.T. was responsible for maintenance of the vehicles it leased, including any parts and accessories, or, alternatively, O.S.T. was permitted to "cause" someone else to perform the necessary maintenance. In either case, because the toolbox is a part or accessory of a leased truck, repairs and maintenance on the toolbox were within the activities of O.S.T., the I.C.C. carrier. Furthermore, the O.S.T./Perry lease required Mr. Perry to perform services for and on behalf of O.S.T, including keeping the tractor in good safe operation. Appellant, there-

---

**15.** *See Ennis v. Crenca,* 322 Md. 285, 587 A.2d 485 (1991) (scope of employment requires that acts were done in furtherance of employer's business and were said to have been authorized by employer); *Hooper v. Brawner,* 148 Md. 417, 129 A. 672 (1925) (rule of respondeat superior rests on power of control of superior over subordinate). Lest there be any confusion, we are borrowing from respondeat superior jurisprudence for the sole purpose of determining whether Empire's policy furnishes coverage. We are in no way concerned with determining the party or parties upon whose shoulders rests ultimate liability.

fore, concludes that pursuant to either federal regulations or the O.S.T./Perry lease, the acquisition of the toolbox parts was in the furtherance of O.S.T.'s business.

Appellant fails to acknowledge, however, that the accident occurred while Mr. Perry was driving home, after he had picked up the parts for the toolbox. Generally, once a lessor-driver returns to his "home terminal" after completing an assignment, his business with the carrier-lessee is complete. If the lessor then drives to his residence, he is no longer operating the truck in the business of the I.C.C. carrier. *See, e.g., Pace v. Couture,* 150 Ind.App. 220, 276 N.E.2d 213, 218–19 (1971) (holding that trucker was not in business of another when he had dropped off load, was told he had no other assignment, and thereafter bobtailed home). In *Saint Paul Fire & Marine Ins. Co. v. Frankart,* the court formulated three indicia for recognizing the point in time when an owner-driver's engagement in the lessee's business terminates: (1) when he returns to the point where the haul originated; (2) when he arrives at the terminal from which the haul was assigned; or (3) when he returns to his "home terminal"—the place from which he customarily obtains his next assignment. 69 Ill.2d at 218–19, 13 Ill.Dec. at 35, 370 N.E.2d at 1062. Furthermore, the driver-lessor need not formally return to the "home-terminal" in order for his business with the I.C.C. carrier to be complete. Instead, the driver-lessor is no longer operating his truck in the business of the I.C.C. carrier once he has returned to the area from where he was dispatched. *See McLean Trucking Co. v. Occidental Fire & Cas. Co.,* 72 N.C.App. 285, 324 S.E.2d 633, *review denied,* 313 N.C. 603, 330 S.E.2d 611 (1985) (holding that by returning to *the area* from where he was dispatched, owner-lessor had effectively returned to terminal from where the freight was assigned and was not thereafter "in the business of" the lessee at the time of the accident because driver was heading home). *See also Liberty Mut. Ins. Co. v. Connecticut Indem. Co,* 55 F.3d at 1337 (noting an important factor in decisions that have held truck was not operated in business of I.C.C. carrier was that

driver had either completed delivery or was not assigned any delivery when the accident occurred).

In the instant case, the accident occurred after Mr. Perry had returned to his "home terminal." He was not under dispatch, nor had he been assigned another load. Even assuming, *arguendo*, that the stop at the Peterbuilt dealership was for purposes of furthering the business of the I.C.C. carrier,[16] once he purchased the parts for the toolbox, his business with the I.C.C. carrier was complete. He was in the area of his "home terminal" and was heading home. Based on the holdings of *McLean* and *Frankart*, we conclude that at the time the accident occurred, Mr. Perry was not operating his truck in the business of O.S.T.

Appellant has not cited, nor has our own research uncovered, a case holding that a vehicle was used "in the business" of a carrier-lessee when the vehicle was being driven to driver-lessor's home after delivering a trailer, returning to the area of his home terminal, and not having another load assigned. As such, the bevy of cases cited by Empire fails to

16. There is authority for appellee's position that the repairs in question were in the business of the driver-lessor, rather than the carrier-lessee. Appellant cites *Neal v. St. Paul Fire & Marine Ins. Co.*, 197 Neb. 718, 250 N.W.2d 648 (1977), in which an accident occurred while a tractor was being driven by an owner/operator to be serviced. The court held that this was in the "business" of the operator instead of the carrier, although the carrier received an incidental benefit from the fact that the operator attended to maintenance of the tractor between trips. The court premised its holding on the fact that the servicing and maintenance of the tractor were the sole responsibility of the owner/operator and were to be done at his expense, and when the owner/operator was carrying no freight of any kind at the time the accident happened. *Id.* at 650. Furthermore, in *Protective Ins. Co. v. Dart Transit Co.*, 293 Minn. 402, 197 N.W.2d 668 (1972), a driver-lessor was driving his tractor from his residence to a repair garage to have repairs made on the tractor when an accident occurred. The court held that an exclusion contained in the lessor's bobtail policy as to coverage when the equipment is operating under orders of a trucking company was inapplicable notwithstanding that after the repairs were completed the insured intended to make a trip for the trucking company. The responsibility for repairs were established by the lease and he was not under orders from the company to repair. *See also Nationwide Ins. Co. v. Docompo*, 168 N.J.Super. 561, 403 A.2d 948 (1979).

extricate it from its coverage obligations. *Liberty Mut. Ins. Co. v. Connecticut Indem. Co.,* 55 F.3d 1333 (driver en route to retrieve and complete assigned delivery; driver had taken trailer away from terminal but had uncoupled it from his tractor so that he could bobtail home for weekend); *Hartford Ins. Co. v. Occidental Fire & Cas. Co.,* 908 F.2d 235 (accident occurred while driver was in process of making a delivery for the lessee and was en route to pick up trailer that required repairs in order to complete delivery); *Freed v. Travelers,* 300 F.2d 395 (7th Cir.1962) (accident occurred while owner was taking tractor leased to trucking company to a garage for repairs); *Central Nat'l Ins. Co. v. Liberty Mutual Ins. Co.,* 685 F.Supp. 123 (driver was pulling empty trailer between terminals); *Carriers Ins. Co. v. Griffie,* 357 F.Supp. 441 (W.D.Pa.1973) (accident occurred during an inspection required by carrier, pursuant to carrier's company policy at a garage selected by carrier and at the cost of carrier); *Empire Fire & Marine Ins. Co. v. Insurance Co. of the State of Penna.,* 638 So.2d 102 (Fla.App.), *cert. denied,* 513 U.S. 1051, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994) (accident occurred when a trucker bobtailed to a service station to obtain an oil change between assignments); *Simpkins v. Protective Ins. Co.,* 94 Ill.App.3d 951, 50 Ill.Dec. 449, 419 N.E.2d 557, 561 (1981) (basing its decision on fact that driver was under dispatch, the court held that owner heading to terminal to pick up load was operating in business of carrier); *Mullins,* 83 Ohio App.3d 517, 615 N.E.2d 305 (holding that truck was not being driven for personal purposes when upon being notified that he was next in line for a load, owner drove toward terminal to be ready to receive load).[17]

We are mindful of the inference that Mr. Perry probably intended to install the parts he had purchased once

---

**17.** In *Mullins,* the court declined the insurer's invitation to apply workers' compensation law under which an employee injured on the way to work is not considered to have been injured "in the course of employment." Under respondeat superior principles, however, the court concluded the facts made it clear that the truck driver was engaged in the lessee's business when the accident occurred.

he arrived at his residence. As such, Empire might contend that at the time of the accident, the tractor was being operated in the business of O.S.T. because he was heading toward the facility wherein he intended to have the necessary repairs effectuated, namely his residence. Such reasoning, however, would eviscerate the holdings of *McLean* and *Frankart* because it could always be argued that the lessor-driver was heading home in order to perform some minor repairs on his truck and, therefore, was in the business of the trucker-carrier. Furthermore, we note in passing that the mere fact that the vehicle was under lease is not dispositive of whether the vehicle was being used in the business of the lessee. As the trial court recognized, to hold otherwise would render the lessor's bobtail insurance a nullity because if the permanent lessee's insurer was always liable, there would be no need for the lessor to obtain bobtail insurance. *See also Grimes v. Nationwide Mut. Ins. Co.*, 705 S.W.2d 926, 931 (Ky.App.1985). Clearly, there must be some point when a leased bobtailing tractor is not being operated in the business of the carrier-lessee. In this case, we hold that one such instance is when a truck is being driven to the driver-lessor's residence after delivering his assigned load and returning to the area from where he was dispatched.

Finally, Empire's public policy contentions cannot rescue it from its coverage obligations. The mere fact that the lessee is ordinarily liable by virtue of the federal regulatory scheme [18] does not prevent liability from being imposed upon the lessor. *Carolina Cas. Ins. Co. v. Insurance Co. of N. Am.*, 595 F.2d 128, 139 (3d Cir.1979); *Huber v. Henley*, 669 F.Supp. 1474, 1482 (S.D.Ind.1987); *Johnson v. Motors Dispatch, Inc.*, 172 Ind.App. 285, 360 N.E.2d 224 (1977); *contra Proctor v. Colonial Refrigerated Transp., Inc.*, 494 F.2d 89, 92 (4th Cir.1974) (referring to 49 C.F.R. 1057.12(c)(1), the court held that regulations required carrier-lessee to "assume full responsibility for negligence of [the lessor] as driver of the leased equipment"); *Ryder Truck Rental Co., Inc. v. U.T.F.*

---

18. *See, infra*, at 111–113.

*Carriers, Inc.,* 719 F.Supp. 455, 459 (W.D.Va.1989), *aff'd,* 907 F.2d 34 (4th Cir.1990). If a lessor could be held liable, it follows that its non-trucking use insurer may have to furnish coverage in accordance with the terms of the policy it issued. Accordingly, public policy does not require that insurers of lessors be absolved from risks they voluntarily assume solely because the vehicle was subsequently leased to an interstate carrier. *Empire Fire and Marine Ins. Co. v. Guaranty Nat'l Ins. Co.,* 868 F.2d 357 (10th Cir.); *American General Fire and Cas. Co. v. Truck Ins. Exch.,* 660 F.Supp. 557 (D.Kan.1987).

### IV.

Having determined that the "business use" exclusion in Empire's policy does not alleviate appellant's duty to furnish coverage, we now address appellant's contention that Liberty is obligated to provide coverage under a permissive use provision contained in the policy Liberty issued to O.S.T. Our review of the proceedings below clearly indicates that this contention was raised with the circuit court. Unfortunately, the record does not indicate why the trial court failed to travel this potential avenue of coverage in its Ruling on Cross Motions for Summary Judgment.

Appellee offers several arguments in support of a finding of no coverage under its policy's permissive use provision. First, Liberty refers us to the Court of Appeals's decision in *Fisher v. Tyler,* 284 Md. 100, 394 A.2d 1199 (1978). In *Fisher,* the term "hired auto" was not defined in a policy, but the Court defined hired automobile to mean an automobile "whose temporary use has been engaged for a fixed sum." Further, appellant cites *Black's Law Dictionary* which defines the verb "hire" as "[t]o purchase the temporary use of a thing, or to arrange for the labor or services of another for a stipulated compensation." *Id.* at 729 (6th ed.1990). Accordingly, appellee focuses upon the compensatory aspect of the aforementioned authority in urging us to conclude that the tractor being driven by Mr. Perry was not under hire at the time of the accident because Mr. Perry was not then being compensated for the use of the trailer.

We note at the outset that there appears to be a great deal of variation in omnibus clauses from policy to policy. Because these clauses are part of contracts, it follows that they must be interpreted pursuant to their terms on a contract by contract basis, and not by sweeping language saying that regardless of the exact provisions of the contract we shall interpret all similar, but not identical, contracts alike.

*National Grange Mut. Ins. Co. v. Pinkney*, 284 Md. 694, 704, 399 A.2d 877, 883 (1979). As such, the definitions of "hire" offered by appellee, while of some utility, are not dispositive in our analysis. Before we can accept the definition of hired that appellee urges upon us, we must view the policy in its entirety, rather then casting a myopic focus on one isolated provision. *See Sullins, supra; Nolt, supra; Simkins Indus., Inc. v. Lexington Ins., supra.* In so doing, we note that, absent a provision to the contrary, the same words used in different clauses will be construed to have been used in the same sense. *Strand v. State Farm Ins. Co.*, 34 Ohio App.3d 97, 517 N.E.2d 265 (1986). Thus, in determining whether appellee's construction of the term hired is reasonable and comports with the statutory policy mandating that operators of motor vehicles furnish adequate security as enumerated by the germane federal and state regulations,[19] we examine all provisions containing the term hired, and employ the definition of hired suggested by appellee.

In performing this analysis, we need venture no further than ¶ II., A., 1., b., of Liberty's policy. *See, supra,* at 87. In sum, this provision extends coverage to the owner of a covered auto from whom the policy holder "hires" or borrows a covered auto while the auto is being used exclusively in O.S.T.'s business as "trucker." Appellee's construction must

---

19. *See, e.g.,* Md. Ann.Code, art. 48A, § 541; Md.Code Ann., Transp. II § 17–103. The remedial purpose of Maryland's compulsory insurance law is to ensure that those who own and operate motor vehicles registered in the State are financially able to pay compensation for damages resulting from motor vehicle accidents. *Enterprise Leasing Co. v. Allstate Ins. Co.*, 341 Md. 541, 671 A.2d 509 (1996).

be rejected because it has the potential for creating serious coverage gaps between appellant's bobtail policy and appellee's trucking-use policy. Based on appellee's definition of hired, situations will arise when a tractor would not be covered by either an I.C.C. carrier's trucking policy or the owner-lessor's non-trucking use policy. For instance, a tractor en route to a repair shop for necessary repairs is frequently deemed to be operating in the business of the I.C.C. carrier. In such cases, however, a business use exclusion in a non-trucking insurance policy would relieve the non-trucking insurer from liability. In addition, the lessor-owner is frequently not compensated while the vehicle is undergoing maintenance. Because the lessor-owner is not being compensated during periods in which the vehicle is en route to the repair shop, appellee would have us hold that the truck is not hired, thereby resulting in a finding of no coverage on the part of the I.C.C. carrier's policy. Because neither policy would afford coverage in these instances, appellee's definition of hired must be rejected. Further, we note that the term "hired" is sufficiently vague to render the provision ambiguous. Absent the aforementioned statutory policy, we cannot ascertain whether the term was intended to encompass vehicles under a lease or rental agreement, *see Wells v. Allstate Ins. Co.*, 327 F.Supp. 622 (D.S.C.1971) (terms hiring and renting are synonymous), or was limited to vehicles hired on a more temporary basis. Because the record does not contain any parole or extrinsic evidence to ameliorate this ambiguity, we shall construe the term against the drafter, Liberty. Accordingly, we conclude that, at the time of the accident, Mr. Perry's truck was hired by the Liberty policy's named insured, O.S.T.[20]

---

**20.** We also note in passing that polices usually exclude from omnibus insured clauses the owner of any vehicle hired by the insured. Such an exclusion is generally warranted because the owner of a leased vehicle ordinarily carries his own liability insurance. *See Good v. Reliance Ins. Co.*, 598 F.Supp. 332 (D.Wyo.1984); *Longsdorf v. Tunson*, 200 F.Supp. 828 (D.Colo.1962). Usually, policies with a permissive use clause that exclude the owner of a vehicle from whom the policy holder hires, rents, or leases, will provide coverage elsewhere when the owner-lessor is operating the insured vehicle in the business of the policy holder.

Turning to whether Mr. Perry's use of the leased tractor was permissive, both parties, while acknowledging that the circuit court failed to address this issue, invite us to resolve this question, respectively contending that Mr. Perry's use was either permissive or not permissive. Appellant posits that because the tractor belonged to Mr. Perry, his use of the truck must necessarily have been permissive. Further, appellant asserts that the lease required Mr. Perry to perform such other services on behalf of O.S.T., including O.S.T.'s duty to maintain and keep the tractor safe. Appellee retorts by noting that there is nothing in the record indicating that Mr. Perry had permission to use the truck when the accident occurred, thereby mandating a finding of no permissive use.

 Permission is "[a] license to do a thing; an authority to do an act which, without, would have been unlawful. [It is a]n act of permitting, formal consent, authorization, leave, license or liberty granted, and it has a flexible meaning depending upon the sense in which it is used." *Nationwide Mut. Ins. Co. v. Continental Cas. Co.*, 87 Md.App. 261, 269, 589 A.2d 556, 560 (1991) (quoting *Black's Law Dictionary* at 1026 (5th ed.1979)); *see also Fisher v. United States Fidelity & Guar. Co.*, 86 Md.App. 322, 586 A.2d 783 (1991) (quoting *Black's Law Dictionary* (6th ed.1990)). Ordinarily, a presumption exists that the driver of a vehicle is a permissive user, effectively shifting the burden of proof to the insurer to establish that the driver did not have permission when the accident occurred. *State Farm Mut. Auto. Ins. Co. v. Martin Marietta Corp.*, 105 Md.App. 1, 657 A.2d 1183 (1995), *appeal dismissed*, 342 Md. 603, 679 A.2d 104 (1996). The existence of permission "is largely a factual determination, and one which varies in response to the circumstances presented in each case." *Bond*, 289 Md. at 385, 424 A.2d at 768. *See Liberty Mut. Ins. Co. v. Tiller*, 189 Va. 544, 53 S.E.2d 814 (1949)(hold-

---

The policy issued by Liberty in this case did not completely exclude the owner of vehicles leased to O.S.T. from its permissive use provision. Instead, only owners of "private passenger type auto[s]" were excluded. In contrast, Empire's policy excluded all owners of vehicles leased by the named insured from its permissive use provision.

ing that permission was a question of fact in case where vehicle was driven by person employed to drive truck who kept it at all times). *See generally, 12 Couch on Insurance* 2d § 45:366 (1981). In construing permissive use provisions, therefore, Maryland courts employ a "total facts" approach, relying on the policy language and the particular facts at hand. *See Cohen v. American Home Assur. Co.*, 255 Md. 334, 258 A.2d 225 (1969).[21] *See generally* A. Janquitto, *Maryland Motor Vehicle Insurance* § 7.7(B) at 176 (1992).

One prerequisite to coverage under a permissive use provision, which both parties have overlooked, is that the person ostensibly giving permission or consent must have the power to do so. Accordingly, under the "total facts" approach, the Court of Appeals has limited the scope of who may grant permission to only persons who have *the right and power to control the vehicle. Keystone Ins. Co. v. Fidelity & Cas. Co.*, 256 Md. 423, 260 A.2d 275 (1970); *Selected Risks v. Miller*, 227 Md. 174, 175 A.2d 584 (1961). In *Selected Risks,* a woman was the named insured and record owner of a car purchased by her husband, who was unable to obtain financing in his own name because he was unemployed. From the time of their separation until the time of the accident, the car was in the sole control of the husband. Thus, the named insured, although the title owner, was not the true or equitable owner of the vehicle. The policy in *Selected Risks* covered, in relevant part, the operation of the owned vehicle by the named insured, any resident of the same household, and any other persons, provided the actual use was with the permission of the named insured.

The Court in *Selected Risks* held that the third-party driver who had the permission of the husband to use the car at the time of the accident was not a "person insured" under this provision because he had no permission from the wife, the

---

**21.** *Cf. DeJarnette v. Federal Kemper Ins. Co.*, 299 Md. 708, 714, 475 A.2d 454, 457 (1984) in which the Court recognized that omnibus clauses are designed to provide coverage and, therefore, "must be liberally construed in favor of the insured."

named insured. The Court found that the lack of actual ownership interest vitiated the named insured's ability to grant permission. Accordingly, coverage was not extended to the permittee of the equitable owner. In so holding, the Court reasoned as follows:

> [T]he word "permission" or "consent" connotes the power to grant or withhold it, and, therefore, in order for one's use and operation of an automobile to be within the meaning of an omnibus clause requiring the permission or consent of the named insured, the latter must, as a general rule, own the insured vehicle or have such an interest in it that he is entitled to the possession and control of the vehicle and in a position to give such permission. Thus, it has been held that an omnibus or extended coverage clause in an insurance policy requiring the permission of the named insured does not apply, where the insurance is taken out in the name of one not the real owner, to cover the real owner in actual possession and control of the vehicle, since the named insured does not have the power to grant or withhold permission.

*Selected Risks,* 227 Md. at 178, 175 A.2d at 586. *See also Unsatisfied Claim & Judgment Fund v. United States Fidelity & Guar. Co.,* 256 Md. 412, 260 A.2d 279 (1970); *Wehland v. Nationwide Mut. Ins. Co.,* 336 F.Supp. 360 (D.Md.1971) (applying Maryland law); *Howell v. Accident & Cas. Ins. Co.,* 32 Tenn.App. 83, 221 S.W.2d 901 (1949). *See generally* 7 Am. Jur.2d, *Automobile Insurance,* § 115 (1963), *quoted with approval in Unsatisfied Claim & Judgment Fund,* 256 Md. at 418, 260 A.2d 279. Finally, one leading commentator has opined:

> The permission granted must be in the nature of a revocable license, and implies a right to refuse, and does not extend to relationships in which the donor of permission does not have power to terminate the license. Likewise, there is implicit in the term the element that the automobile is still the property of the insured, and that its return to him is contemplated. Thus, *there is no operation of a vehicle under a permission when the operator has the right and*

*power to use the automobile and does so by virtue of his own right and not by permission of another.*

12 *Couch on Insurance* 2d § 45:343 (1981) (emphasis added) (footnotes omitted). In other words, a permissive use provision is inapplicable when the insurance was taken out in the name of one who is not the real owner, to cover the real owner in actual possession and control of the vehicle, because the named insured does not have power to grant or withhold permission. *See Didlake v. Standard Ins. Co.,* 195 F.2d 247 (10th Cir.1954).

▮ Turning to the context of liability arising out of equipment leased to an I.C.C. carrier, our research failed to uncover a case squarely addressing whether an I.C.C. carrier is vested with the power to grant permission to an owner-lessor so as to bring the owner within the ambit of a policy's permissive use clause. In the case at bar, contrary to the I.C.C. regulations, the O.S.T/Perry lease does not expressly provide that O.S.T. is to be granted exclusive possession and control of Mr. Perry's truck during the term of the lease. Nonetheless, it would certainly be proper to graft onto the lease 49 C.F.R. § 1057.12(c), which requires that lessees assume full responsibility and control over the vehicles they lease. From section 1057.12(c) one could deduce that because the regulations require a lessee to assume full control over vehicles it leases, a lessee must necessarily have the authority to grant an owner-lessor the requisite permission so as to satisfy this threshold under a permissive use clause. In our view, however, section 1057.12(c), even when grafted onto the O.S.T./Perry lease, does not compel such a conclusion as a matter of law.

▮ "In order to protect the public from the tortious conduct of judgment proof operators of interstate motor carrier vehicles, Congress ... amended the ... Act to require a motor carrier to assume full direction and control of leased vehicles." *Price v. Westmoreland,* 727 F.2d 494, 496 (5th Cir.1984). As we noted in Part I, the principal functions of the I.C.C. regulations are to prevent carriers from evading

liability for injuries caused by their lessor drivers by claiming that such drivers were independent contractors; to prevent carriers from circumventing I.C.C. safety standards by leasing equipment from non-regulated truckers; to provide the public with financially responsible carriers; and to put the use and operation of leased equipment on a par with equipment owned by the authorized carrier and operated by its own employees. *Indiana Refrigerator Lines, Inc. v. Dalton*, 516 F.2d 795, 796 (6th Cir.), *cert. denied*, 423 U.S. 985, 96 S.Ct. 392, 46 L.Ed.2d 302 (1975); *Ryder Truck Rental*, 719 F.Supp. at 458; *Riley Whittle, Inc.*, 701 P.2d at 579; *Schell, supra; Frankart*, 69 Ill.2d at 213, 13 Ill.Dec. 31, 370 N.E.2d 1058; *Hershberger v. Home Transp. Co.*, 103 Ill.App.3d 348, 59 Ill.Dec. 53, 55, 431 N.E.2d 72, 74 (1982). Consequently, under the regulatory scheme, the carrier-lessee's liability for negligent acts of its owner-lessors is frequently premised on 49 C.F.R. § 1057.12(c) which requires that leases between a truck owner and carrier-lessee contain the following provision:

(1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation for the equipment for the duration of the lease.[22]

Furthermore, as we noted in Part I, I.C.C. carriers are required to maintain minimum levels of liability insurance for personal injuries arising out of the maintenance or use of leased vehicles. Consequently, "[t]he majority of courts considering the issue have held that during the lease term, the I.C.C. carrier is liable for the lessor's negligence, even if the lessor is not engaged in a job for the lessee at the time of the accident." *Williamson v. Steco Sales, Inc.*, 191 Wis.2d 608, 616, 530 N.W.2d 412, 416 (App.), *review denied*, 537 N.W.2d 571 (Wis.1995). *See, e.g., Hartford Ins. Co. v. Occidental Fire & Cas. Co.*, 908 F.2d at 237; *Rodriguez v. Ager*, 705 F.2d 1229

---

**22.** The statutory basis of this regulation is 49 U.S.C. § 11107(a)(4). *Zamalloa v. Hart*, 31 F.3d 911, 914 (9th Cir.1994).

(10th Cir.1983); *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473 (3d Cir.1961); *Rediehs Express, Inc. v. Maple*, 491 N.E.2d 1006 (Ind.App.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987). *See also Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131 (8th Cir.1974); *Wyckoff Trucking, Inc. v. Marsh Bros. Trucking Serv. Inc.*, 58 Ohio St.3d 261, 265–66, 569 N.E.2d 1049, 1053 (1991). Essentially, the I.C.C. regulations prevent a carrier from asserting the defense that the lessor of the vehicle is an independent contractor for whom the lessee has no responsibility. *See Westmoreland*, 727 F.2d at 496; *Proctor*, 494 F.2d at 91; *Simmons v. King*, 478 F.2d 857, 860 (5th Cir.1973); *Ryder Truck Rental, supra; Baker v. Roberts Express, Inc.*, 800 F.Supp. 1571 (S.D.Ohio 1992); *Cosmopolitan Mutual Ins. Co. v. White*, 336 F.Supp. 92, 98 (D.Del.1972); *Schell v. Navajo Freight Lines Inc.*, 693 P.2d 382, 384 (Colo.App.1984); *Transport Indem., Co. v. Teter*, 575 S.W.2d 780 (Mo.App.1978). Indeed, the weight of authority holds that federal regulation of interstate carriers preempts state common law for purposes of determining the liability to which authorized carrier-lessees are subject under the jurisdiction of the I.C.C., including the doctrine of respondent superior and its accompanying jurisprudence. *Judy v. Tri–State Motor Transit Co.*, 844 F.2d 1496, 1501 (11th Cir.1988); *Planet Ins. Co. v. Transport Indem.*, 823 F.2d 285, 288 (9th Cir.1987); *Westmoreland, supra; Baker, supra; Ryder Truck Rental, supra.*

 Unlike the issue of liability, the federal regulations do not preempt state common law principles governing the construction and application of permissive use clauses contained in motor vehicle liability policies. Instead, the majority rule appears to be that while the federal statutes and regulations might *affect* the liability among policyholder and insurance companies,[23] they do not *control* the liability among them.

---

**23.** For instance, the display of I.C.C. placards furnishes evidence that the lessor was engaged in the business of the lessee under the terms of a policy. *See, e.g., Kreider Truck Serv., Inc. v. Augustine*, 76 Ill.2d 535, 31 Ill.Dec. 802, 394 N.E.2d 1179 (1979); *Occidental Fire & Cas. Co. v. Padgett*, 113 Ill.App.3d 215, 68 Ill.Dec. 766, 446 N.E.2d 937 (1983).

*See, e.g., Transamerican Freight Lines, supra; Grinnell Mutual Reinsurance Co. v. Empire Fire & Marine Ins. Co.,* 722 F.2d 1400, 1404 (8th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 540 (1984); *Transport Ins. Co. v. Protective Ins. Co.,* 696 F.Supp. 870 (S.D.N.Y.1988), *aff'd without op.,* 868 F.2d 1267 (2d Cir.1988). Thus, a finding of liability on the part of a carrier does not compel a finding that the carrier's insurer must furnish coverage. *See, e.g., Wellman v. Liberty Mut. Ins. Co.,* 496 F.2d 131 (8th Cir.1974). Indeed, the fact that the regulations governing leases address bobtail insurance evinces the regulators' recognition that there would be instances when a lessee would not be in the exclusive possession and control of the leased equipment. Similarly, the fact that the O.S.T./Perry lease provided for bobtail insurance is evidence that the parties recognized that, under the circumstances, O.S.T. would not be in the exclusive possession and control of Mr. Perry's truck. *Midwestern Indem. Co. v. Reliance Ins. Co.,* 44 Ohio App.3d 83, 541 N.E.2d 478 (1988), *appeal dismissed,* 43 Ohio St.3d 610, 539 N.E.2d 628 (1989). Accordingly, application of section 1057.12 of the regulations to the case at bar does not compel the conclusion that O.S.T. had the power to grant Mr. Perry permission to use the truck so as to bring Mr. Perry within the scope of Liberty's permissive use clause. Instead, the quantum of possession and control over the truck that O.S.T was actually permitted to exercise governs whether O.S.T had the power to grant Mr. Perry permission to use the truck so as to implicate the Liberty permissive use provision.

Because the Agreed Statement of Facts furnished by the parties to both the circuit court and this court does not disclose the extent of control O.S.T. was actually permitted to exercise over the truck Mr. Perry was driving, we are unable to determine whether O.S.T. was a proper permittor so as to trigger coverage under Liberty's permissive use provision. Remand for such findings, therefore, is warranted.

Furthermore, the Agreed Statement of Facts does not conclusively establish whether O.S.T. actually granted Mr. Perry permission to use the truck, and if so, whether Mr.

Perry exceeded the scope of that permission. *See Nationwide Mut. Ins. Co. v. Continental Cas. Co.*, 87 Md.App. 261, 589 A.2d 556, *cert. denied*, 324 Md. 122, 596 A.2d 628 (1991) (holding that language "using with your permission" implicitly incorporates qualifiers "with actual permission" and "within the scope of the permission"). Assuming, *arguendo*, that under the terms of the lease Mr. Perry had permission to bring the truck to the repair shop for maintenance, the terms of the lease do not compel the conclusion that Mr. Perry was permitted thereafter to use the truck merely for the purpose of picking up parts and accessories. The record is entirely devoid on whether such permission was granted. Accordingly, we cannot conclude as a matter of law that, at the time of the accident, Mr. Perry was operating the truck with O.S.T.'s permission. A remand for further findings, therefore, is warranted.

In order to provide the trial court with some guidance we offer the following suggestions. Permission can be either express or implied. *See, e.g., Bond, supra; Federal Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 341 A.2d 399 (1975); *Blue Bird Cab Co. v. Amalgamated Cas. Ins. Co.*, 109 Md.App. 378, 675 A.2d 122 (1996). Accordingly, in determining whether Mr. Perry had permission to use the tractor at the time of the accident, the trial judge should determine whether O.S.T. granted Mr. Perry express permission to use the truck when picking up parts and accessories necessary for the maintenance the vehicle. If not, the court should delve into whether O.S.T. had granted implied permission by somehow signifying its consent. In some cases, the permittor's mere silence has been held to be a sufficient indicia of implied permission. *See 12 Couch, supra*, § 45:354 at 702 & n.8 and cases cited therein. Nonetheless, omnibus clauses generally contemplate more than mere acquiescence. *See id.* at 702 & n. 9 and cases cited therein.

Two common sources of proof of implied permission are an insured's acquiescence in a prior course of conduct, *Motorists Mut. Ins. Cos. v. Great Lakes Labs., Inc.*, 687 F.Supp. 198 (W.D.Pa.1988); *Standard Mut. Ins. Co. v. Sentry*

*Ins.,* 146 Ill.App.3d 905, 100 Ill.Dec. 498, 497 N.E.2d 476 (1986); *Philyaw v. Mid–Am. Indem. Co.,* 548 So.2d 83 (La. App.1989); *Shelter Mut. Ins. Co. v. Baker,* 753 S.W.2d 646 (Mo.App.1988), and the foreseeability of the purportedly permitted use. To determine whether a prior course of conduct amounts to implied permission, among the factors the court should consider is whether (1) there were prior instances of similar use made of the vehicle by Mr. Perry; (2) O.S.T was aware of these earlier uses; and (3) the use occurred over a sufficient period of time without objection by the named insured so that a reasonable person would believe that the owner had a right to assume he or she had permission to use the truck under the circumstances that existed when the accident occurred. *See, e.g., American Family Ins. Group v. Howe,* 584 F.Supp. 369 (D.S.D.1984); *Wise v. Ohio Casualty Ins. Co.,* 96 F.Supp. 380 (D.Ky.), *aff'd,* 192 F.2d 1022 (6th Cir.1951); *Nationwide Mut. Ins. Co. v. Land,* 318 N.C. 551, 350 S.E.2d 500 (1986). When performing this inquiry, the common practices of the business or industry should also be considered. Implied permission may also arise if the owner operated the truck in a manner such that a reasonable person in the shoes of O.S.T would conclude that the use of the vehicle on the date in question was foreseeable. Accordingly, some factors the trial court should also consider is whether (1) the use was an integral part of the operation undertaken with the insured's knowledge and consent, *see, e.g., North River Ins. Co. v. Gurney,* 603 S.W.2d 280 (Tex.Civ.App.1980); (2) the use was a topic of recent communications between the insured and the permittee concerning potential uses of the tractor, *Standard Mut. Ins. Co. v. Sentry Ins., supra;* and (3) the insured's grant of express permission justifying an inference of a broader scope of consent. *Stoll v. Hawkeye Cas. Co.,* 193 F.2d 255 (8th Cir.1952). *See generally 12 Couch, supra,* § 45:352.

## V.

In order to expedite the final disposition of this case, we offer the trial court the following guidance in resolving the potential double coverage issues in the event it ultimately

concludes that Liberty is obligated to provide coverage under its permissive use clause. Double insurance exists when more than one policy covers a claim involving a single vehicle. *Nolt, supra.* Primary insurance is insurance that "attaches immediately upon the happening of the occurrence that gives rise to liability." Excess insurance "attaches only after a predetermined amount of primary coverage has been exhausted." *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.,* 126 Cal.App.3d 593, 178 Cal.Rptr. 908 (1981), *quoted with approval in United States Fire Ins. v. Maryland Cas. Co.,* 52 Md.App. 269, 272, 447 A.2d 896, 898 (1982).

Based on ¶ IV., B., 5., a. of Empire's policy[24] and our affirmance of the trial court's determination concerning Empire's obligation to provide coverage, Empire's insurance obligation is primary. Next, the circuit court must determine whether Liberty's coverage is primary or excess. Contrary to the majority of courts that have considered this issue, Maryland has adopted the position that an insurer that issued a BMC/MCS–90 Endorsement is a primary carrier as a matter of law. In *Allstate Ins. Co. v. Federal Ins. Co.,* 23 Md.App. 105, 326 A.2d 29 (1974), *modified,* 275 Md. 460, 341 A.2d 399 (1975), we stated that "[i]n our view the intent of Congress and the I.C.C. was that the insurance company which wrote the I.C.C. endorsement would be responsible for primary coverage, both as a matter of law and of public policy." *Id.* at 118–19, 326 A.2d at 37. Although our opinion in that case was modified on other grounds, the Court of Appeals adopted the reasoning quoted herein. *See* 275 Md. at 478–79, 341 A.2d at 410. Thus, if Liberty is obligated to provide coverage, its obligation, as a matter of law, is primary. Contrary to appellant's assertions, however, an I.C.C. form endorsement does not establish primary liability over other policies that are primary by their own terms. *Empire Fire and Marine Ins. Co. v. Guaranty Nat. Ins. Co.,* 868 F.2d 357, 361–63 (10th Cir.1989); *American General Fire & Cas. Co. v. Truck Ins. Exch.,* 660 F.Supp. 557 (D.Kan.1987); *L.R.C. Truck Line, Inc.*

---

24. *See, supra,* at 86.

*v. Berryhill,* 98 N.C.App. 306, 390 S.E.2d 692 (1990). Accordingly, the MCS–90 Endorsement to Liberty's policy does not relieve Empire of its status as a primary insurer.

*VI.*

In the event that Liberty and Empire are both deemed primary insurers, the court must attempt to resolve any conflicts between the "other insurance" clauses contained in both policies.

> Three general types of "other insurance" clauses commonly appear in modern automobile liability policies: (1) the escape clause, whereby the policy is declared not to cover the insured in a double coverage situation; (2) the excess clause, whereby the insurer declares itself liable up to the limits of its policy only for the excess amount, if any, necessary to indemnify the insured after the other insurer has paid to the full limit of its coverage; (3) the pro rata clause, whereby the insurer obligates itself for a ratable share of the loss in the same proportion which the limit of its own policy coverage bears to the aggregate total coverage protecting the insured.

*Consolidated Mut. Ins. Co. v. Bankers Ins. Co.,* 244 Md. 392, 395–96, 223 A.2d 594, 596 (1966). In cases of dual coverage, Maryland courts attempt to reconcile "other insurance" clauses. *Federal Ins. Co. v. Allstate Ins. Co., supra; National Indem. Co. v. Continental Ins. Co.,* 61 Md.App. 575, 487 A.2d 1191 (1985).

> [T]his approach recognizes that the rights and liabilities of the different insurers involved should depend, as far as possible, upon the specific language of the policies. The relative liabilities of the insurers are contingent, in each case, upon the characterization of the "other insurance" provisions as escape clauses, excess clauses or pro-rata clauses.

*Consolidated,* 244 Md. at 396, 223 A.2d at 597.

If the circuit court concludes that Liberty is obligated to provide coverage under its permissive use clause, then the pro rata clauses in the Empire and Liberty policies

must be reconciled. The general rule is that if there are pro rata or proportionality clauses in several insurance policies insuring the same property, the insurance is concurrent and each insurer is liable for its proportionate amount. *Nolt, supra.* See *Celina Mut. Cas. Co. v. Citizens Cas. Co.*, 194 Md. 236, 71 A.2d 20 (1950). Accordingly, the total loss is prorated on the basis of the maximum coverage limits of each policy.[25]

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY DECLARING THAT EMPIRE FIRE AND MARINE INSURANCE COMPANY IS OBLIGATED TO DEFEND AND INDEMNIFY JAMES PERRY, JR., D/B/A/ J.P. TRANSPORTATION, AFFIRMED; JUDGMENT DECLARING THAT LIBERTY MUTUAL INSURANCE COMPANY IS NOT OBLIGATED TO DEFEND AND INDEMNIFY JAMES PERRY, JR., D/B/A J.P. TRANSPORTATION, VACATED; CASE REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID 50% BY EMPIRE AND 50% BY LIBERTY.

---

**25.** Further, if two policies apply on a pro rata basis, the defense costs are shared on the same basis as liability. *See, e.g., Centennial Ins. Co. v. State Farm. Mut. Auto. Ins. Co.*, 71 Md.App. 152, 164, 524 A.2d 110, 116 (1987), *cert. denied*, 310 Md. 491, 530 A.2d 273 (1987).